HADLOCK, P. J.
*296 Defendant appeals a judgment convicting him of five counts of first-degree sexual abuse and one count of attempted first-degree sexual abuse. He raises 10 assignments of error on appeal, most of which we reject without extended discussion. We write primarily to address two of defendant's arguments. First, we consider defendant's assertion that the trial court erred when it admitted into evidence a recording of a face-to-face conversation between defendant and the victim, M, which M made without defendant's knowledge. We conclude, for reasons explained below, that the surreptitiously recorded conversation was admissible. Second, we address defendant's argument that the trial court erred by admitting a detective's testimony about her experiences with perpetrators and victims of child sexual abuse, including the comparative suggestibility of certain children based on their ages. We disagree with defendant's contention that the detective's testimony amounted to scientific evidence that was presented without the necessary foundation. Accordingly, we affirm.[1]
To the extent that defendant's arguments on appeal challenge the legal bases for the trial court's evidentiary rulings, e.g. , its interpretation of the statutes governing admissibility of surreptitiously recorded conversations, we review those rulings for legal error. Yoshida's Inc. v. Dunn Carney Allen Higgins & Tongue , 272 Or. App. 436, 443, 356 P.3d 121 (2015), rev. den. , 358 Or. 794, 370 P.3d 502 (2016). We describe the facts relevant to the challenged rulings in a manner consistent with the trial court's express *25 findings and those implicit in its rulings, which the record supports. State v. Rosales , 291 Or. App. 762, 764, 423 P.3d 112 (2018). "Because *297 the trial resulted in convictions on all counts, we state the background facts in the light most favorable to the state." State v. Nelson , 246 Or. App. 91, 93, 265 P.3d 8 (2011).
M, who was 12 years old during the events described here, is the daughter of defendant's brother-in-law. M's parents had separated, and M's father had custody of her most of the time. However, both of M's parents had struggled with controlled substances and they sometimes were unavailable or unable to care for her. During those times, M would stay with other relatives, including defendant, who lived with his wife and child on a rural property. Defendant and his family at least sometimes supported M's mother's attempt to gain custody.
M had a room in defendant's house and stayed there a significant amount of the time, sometimes dividing her weeks between defendant's home and one of her parents' homes. Defendant drove M to and from school, took her on family outings, bought her a health club membership, and gave her an allowance. Defendant subscribed to a telephone service and used that service to make calls from his home.
One Saturday night while she was staying at defendant's house, M asked her mother to come get her. When her mother asked why, M explained that "[defendant] has given me all these things because I let him play with me and I don't ever want to see him again. Just please let me come home."
M also sent her mother an audio recording she had made of a conversation between herself and defendant, using an iPhone that did not then have an active telephone subscription. The conversation that M recorded took place when she and defendant were at defendant's house; she made the recording without defendant's knowledge. The recording included a lengthy exchange that began with defendant making a proposition:
"Yeah, this may sound weird to you, but I mean nothing weird by it, okay? Being's [defendant's wife and child] went off and left us this evening, would you like to be my date this evening and go to town and do whatever you would like? Not as in a date type idea, but ..."
*298 The conversation continued with M and defendant discussing the possibility of going "shopping," a term which they sometimes used to describe looking in stores without purchasing anything, or going on a "buying trip." Defendant then suggested that he might give M cash to spend at stores or on a phone card.
Additional statements that M and defendant made could reasonably be interpreted as confirming that defendant would give M money only if she let him do something-the "same thing" he apparently had done before-a thing that M did not want him to do. M told defendant that she does not like to do that "same thing" and that defendant "always say[s] not right now, but just, ow." Defendant then explained himself to M:
"[Defendant:] Well see my problem is [M], is I keep myself up at night telling myself, you're not dreaming about [M]. I'm not gonna dream about [M], and six out of seven nights of the week I dream about you. I think about you all day when I'm out working. Like I said there's something wrong with me.
"[M:] Uh huh.
"[Defendant:] I think about you consistently, all the time."
The conversation continued, with defendant saying that he would take M shopping, but not "buying," and M saying "I don't want you to right now, like, and I can't get any unless you get to right now, and I don't want you to right now, cuz ..." Defendant told M that he had already given her "a bunch of special privileges" that day and declared that those special privileges were "done" and he would not do anything for her that he would not do for his other nieces or nephews. When M asked why, defendant explained:
"[Defendant:] Because you have consistently always dangled the bait out there in front, been a tease, and never follow through. So I kind of decided from now on, you have to earn these special privileges beforehand.
*26 "[M:] Yeah, I know, and I want to go shopping, but I don't want you to have to, I don't want you to do that right now. Like, cuz I want to get that, I want to go shopping and that was happening really soon which means you have to *299 get what you want right now, and I don't want you to right exactly now."
"[Defendant:] So we won't worry about it. We'll just go shopping.
"[M:] Okay, I mean buying. Let's go. I guess we can just go shopping which is looking.
"[Defendant:] (inaudible)
"[M:] Why?
"[Defendant:] Cuz then I can't (inaudible). You mad at me now?"
After hearing that recording, M's mother contacted police on the following Monday morning.
M was interviewed by police later that day. Before that, however, M met with her school counselor, who described M as "very uncomfortable." M told the counselor that she had been touched in a private area "over the top of clothing," but M "really start[ed] to get tight" when the counselor asked whether she had been touched underneath clothing, and the counselor told M they would not discuss that.
Detective Yerrick interviewed M that afternoon. M told Yerrick about several times that defendant had touched her sexually, including on her breasts, buttocks, and vagina. Two incidents occurred when M was in or near a hot tub, others occurred when defendant gave M massages, and others occurred when defendant told M she had to give him a hug.
Defendant was charged with five counts of first-degree sexual abuse and one count of attempted first-degree sexual abuse. The state moved to admit the audio recording that M had made of her conversation with defendant. The trial court granted that motion, and the recording was played for the jury at trial. Witnesses at trial included M, defendant, and Yerrick. We describe Yerrick's testimony in detail later in this opinion, in conjunction with our discussion of defendant's argument that the testimony was erroneously admitted. Here, it is sufficient to note generally that Yerrick described her own experiences investigating reports of child *300 abuse. In that regard, she testified that younger children tend to be more susceptible to "suggestibility" about what happened than older children, that very few cases she had investigated involved a suspect who was "a stranger to the child," and that suspects typically were people "connected to the [victim's] family" and "someone that the parent has a good relationship with." The jury convicted defendant on all counts and he appeals.
THE SURREPTITIOUS RECORDING
In his first assignment of error on appeal, defendant argues that the trial court erred when it admitted evidence of the audio recording that M made, without defendant's knowledge, of her conversation with him. Defendant's argument is based on ORS 165.540,[2] which generally "prohibits, subject to certain exceptions, the interception of a private conversation unless all parties to the conversation are informed that their conversation is being recorded." State v. Klein , 352 Or. 302, 307, 283 P.3d 350 (2012). Except in limited circumstances not applicable here, ORS 41.910 makes inadmissible "the contents of any wire or oral communication" that was intercepted in violation of ORS 165.540. Defendant contends that the recording is inadmissible under those statutes. The state disagrees, asserting that a particular exception to the general prohibition applies, viz. , the "homeowner's exception" created by ORS 165.540(3), which says that the prohibitions *27 described in certain subsections of ORS 165.540(1) "do not apply to subscribers or members of their family who perform the [prohibited acts] in their homes." See generally State v. Rainey , 294 Or. App. 284, 288, 431 P.3d 98 (2018) (describing the subsection (3) exception as the "homeowner's exception").
The statute at issue- ORS 165.540 -is lengthy and any attempt to discern the meaning of the "homeowner's *301 exception" must take into account the entire statute as well as its legislative history. Accordingly, we begin our published analysis by quoting liberally from the statute, before we set out the parties' arguments in more detail. Subsection (1) of ORS 165.540 describes the acts that the statute generally prohibits:
"(1) Except as otherwise provided in [other statutes not applicable here] or subsections (2) to (7) of this section, a person may not:
"(a) Obtain or attempt to obtain the whole or any part of a telecommunication or a radio communication to which the person is not a participant, by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, unless consent is given by at least one participant.
"(b) Tamper with the wires, connections, boxes, fuses, circuits, lines or any other equipment or facilities of a telecommunication or radio communication company over which messages are transmitted, with the intent to obtain unlawfully the contents of a telecommunication or radio communication to which the person is not a participant.
"(c) Obtain or attempt to obtain the whole or any part of a conversation by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, if not all participants in the conversation are specifically informed that their conversation is being obtained.
"(d) Obtain the whole or any part of a conversation, telecommunication or radio communication from any person, while knowing or having good reason to believe that the conversation, telecommunication or radio communication was initially obtained in a manner prohibited by this section.
"(e) Use or attempt to use, or divulge to others, any conversation, telecommunication or radio communication obtained by any means prohibited by this section."
Thus, the first three paragraphs of ORS 165.540(1) describe the basic actions that the statute prohibits. Paragraph (a) prohibits obtaining (or attempting to obtain) telecommunications and radio communications. Those types *302 of communications both involve the transmission of sounds and other signals, either by wired or wireless means.[3] Paragraph (b) prohibits tampering with the equipment or facilities associated with those types of communications, with the intention of obtaining the communications. Paragraph (c) prohibits obtaining "a conversation" unless all parties to the conversation are aware that it is being obtained. A "conversation" is specifically defined to exclude the types of communication that are addressed in paragraphs (a) and (b) of ORS 165.540 : " 'Conversation' means the transmission between two or more persons of an oral communication which is not a telecommunication or a radio communication." The definition includes the kind of conversation that was recorded here-a face-to-face conversation between two people.[4] The prohibition against surreptitiously *28 "obtaining" a conversation includes surreptitiously recording it. See Rainey , 294 Or. App. at 288, 431 P.3d 98 (implicitly so holding); State v. Prew , 213 Or. App. 336, 339, 161 P.3d 323 (2007) (same).
The parties agree, and we concur, that, by surreptitiously recording her face-to-face conversation with defendant on her iPhone, the victim engaged in the conduct described in ORS 165.540(1)(c) -that is, she obtained a conversation by means of a device without all participants in the conversation being aware that that was happening. Under ORS 165.540(1), that conduct was therefore prohibited unless it was permissible under subsections (2) through (7) of the statute.
Subsection (2) of ORS 165.540 provides that the prohibitions in subsection (1) do not apply to certain public *303 officials and certain officers, employees, and agents of telecommunications and radio companies when they are engaged in particular identified activities. Subsections (4) through (7) describe additional exceptions that also apply to specific individuals and activities. The state does not argue that any of those provisions applies here.[5] *304 Subsection (3) of the statute describes the homeowner's exception that is at issue in this case, and it specifically states that the exception applies to the recording of conversations that would otherwise violate ORS 165.540 (1)(c) :
"(3) The prohibitions in subsection (1)(a), (b) or (c) of this section do not apply to subscribers or members of their family who perform the acts prohibited in subsection (1) of this section in their homes."
The question presented is whether the trial court erred when it ruled that the subsection (3) homeowner's exception applies to the iPhone recording that the victim made of her conversation with defendant.
In challenging the applicability of the homeowner's exception, defendant focuses on the legislature's use of the word "subscribers"
*29 in subsection (3). According to defendant, the use of that word means that the exception applies only when a person uses a device to which a person "subscribes" to intercept, listen to, or record a conversation. In defendant's view, that conclusion follows from (1) the ordinary meaning of "subscriber," (2) legislative history suggesting that the legislature intended only to permit telephone subscribers to record face-to-face conversations in their homes using the telephone services to which they subscribe, and (3) the legislature's repeated amendments to ORS 165.540, which have not changed the way in which the word "subscriber" is used in the statute. Defendant posits that the homeowner's exception thus ensures that "a 'subscriber or member of their family' is immune to prosecution for listening in or overhearing conversations on open phone lines or radio transmissions in their own home." (Underscoring in original.) Defendant suggests that the exception embodies legislative intention to "protect[ ] people in the modern era from incidental, accidental, or what is colloquially known as 'butt' dials" and that the exception also may have been *305 aimed at allowing family members to monitor each others' conversations.
Here, defendant argues, the homeowner's exception did not apply because M recorded her face-to-face conversation with defendant using an iPhone that had no telephone service. Accordingly, defendant concludes, neither M nor any of her family members was a "subscriber" within the meaning of ORS 165.540(3), and that provision therefore did not exempt the iPhone recording from the prohibition set out in ORS 165.540(1)(c).
In response, the state acknowledges that the use of the word "subscribers" in ORS 165.540(3) makes the homeowner's exception challenging to apply to the sort of conversations otherwise prohibited by ORS 165.540(1)(c). In its view, the term "subscribers" is a "confusing artifact from the original 1955 statute," which did not address face-to-face communications. Nonetheless, the state offers two ways that subsection (3) can be read to apply here, exempting M's conduct from the subsection (1)(c) prohibition. First, the state suggests, the term "subscribers" could simply be read out of subsection (3), meaning that the homeowner's exception would allow any person to obtain communications that occur in the family home, whether in person or over a telephone line. Second, the state argues, "subscribers" could be interpreted to refer to a person who subscribes to a telephone or radio service, allowing that person or the person's family members to use any device to obtain communications that occur in that home-again, whether in person or over the telephone line. Under either of those interpretations, the state argues, the exception would apply to M, as defendant himself subscribed to a telephone service that he used in his home.
We begin our analysis by considering the statutory text and context and the legislative history, which we find useful here. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009). Because the legislature did not define the term "subscribers," we give the word its ordinary meaning. State v. Walker , 356 Or. 4, 14, 333 P.3d 316 (2014). When the legislature enacted ORS 165.540, the ordinary meaning of "subscriber" was, unsurprisingly, one who "subscribes." Webster's *306 Second New Int'l Dictionary 2513 (unabridged ed. 1961).[6] But the dictionary cannot specify to what a "subscriber" must subscribe to come within the ambit of any particular statute. On that point, both context and legislative history are helpful.
First, subsection (3)-the only part of ORS 165.540 that uses the term "subscribers"-refers back to three subparagraphs of subsection (1), two of which (paragraphs (a) and (b)) refer to telecommunications and radio communications. That cross-reference suggests that the subscription at issue would be to a telecommunication or radio service.
Legislative history confirms that suggestion. "What is now ORS 165.540 was originally *30 adopted in 1955." Rainey , 294 Or. App. at 288, 431 P.3d 98. As we explained in Rainey , the original version of ORS 165.540(1) "prohibited only obtaining or tampering with telecommunications or radio communications; there was no prohibition against recording face-to-face communications." Id . ; see id . at 289, 431 P.3d 98 (noting that the legislature added "what is now paragraph (c), extending the prohibition to 'conversations,' " in 1959). It was in that context that the legislature adopted the homeowner's exception, which then exempted from ORS 165.540(1) 's prohibitions "subscribers or members of their family who perform the acts prohibited in this section in their homes." ORS 165.540(2) (1955). Legislative history from 1955 reflects involvement of telephone companies in drafting the bill that eventually was codified at ORS 165.540. Minutes, Senate Judiciary Committee, Feb. 17, 1955, 1 (comments of senator acknowledging work of the telephone companies on the bill draft and testimony of a representative of the Pacific Telephone and Telegraph Company in support of the bill). Multiple legislators also referred to the proposed homeowner's exception in a way that reflects an understanding that the word "subscribers" was understood to refer to people who subscribed to *307 a telephone service. Minutes, Senate Judiciary Committee, Apr. 21, 1955, 2-3 (statements by Senators Gills, Lowry, and Francis). As we concluded in Rainey , the 1955 legislative history shows that the legislature "fashioned an exception for telecommunication or radio communication subscribers or their families" who engaged in the otherwise prohibited conduct in their homes. 294 Or. App. at 289-90, 431 P.3d 98 (emphasis added).
In that 1955 context, the application of "subscriber" in the homeowner's exception was not difficult to understand. At the very least, it demonstrates a legislative desire to ensure that people who subscribed to telephone services would not be prohibited from recording telephone conversations in their homes. Cf. Minutes, Senate Judiciary Committee, Apr. 21, 1955, 2-3; Apr. 22, 1955, 1 (reflecting consideration of whether to have the exception extend to places of business).
The 1959 amendments to ORS 165.540(1) led to the interpretive challenge we address here. That year, the legislature amended the statute to add paragraph (c), which generally prohibits surreptitious recording of oral conversations, which, by definition, do not include telephone conversations. See ORS 165.535(1) (1959) (defining "conversation" to exclude "a telecommunication or a radio communication").[7] The legislature also amended ORS 165.535 (1959) to add a definition for the term "conversation," used in newly added paragraph (c) of ORS 165.540(1) (1959). In addition, it amended the homeowner's exception to say that the subsection (1) prohibitions "shall not apply to subscribers or members of their family who perform the acts prohibited in subsection (1) of this section in their homes." ORS 165.540(3) (1959). Thus, although the legislature amended the homeowner's exception to explicitly apply to all of the subsection (1) prohibitions-including the newly added prohibition against surreptitious recording of face-to-face conversations-the legislature retained the provision limiting the exception to "subscribers or members of their family" who perform the otherwise prohibited acts "in their homes." The legislative history from 1959 reveals nothing about how *308 the legislature intended the homeowner's exception to apply to recording of face-to-face communications.
In 1961, the legislature amended the homeowner's exception so that it does not apply to all of the subsection (1) prohibitions, as it had previously, but applies only to those set out in paragraphs (a), (b), and (c). ORS 165.540(3) (1961). Thus, while restricting the exception's applicability, the legislature chose to maintain its application to the undisclosed recording of face-to-face communications. Although no legislative minutes, testimony, or other legislative history sheds light on the reasoning behind that decision, it is clear from the way the legislature amended the statute over the years that it specifically intended the homeowner's exception to apply *31 to the conduct-including recording of face-to-face conversations-otherwise prohibited by ORS 165.540(1)(c).
We consider the parties' proposed interpretations of the statute in light of that statutory history, keeping in mind that we are "responsible for identifying the correct interpretation, whether or not asserted by the parties." Stull v. Hoke , 326 Or. 72, 77, 948 P.2d 722 (1997).
Again, defendant contends that the ORS 165.540(3) homeowner's exception applies only to subscribers and their family members who, in their homes, make use of the telephone or radio communication services to which they subscribe to obtain the conversations at issue. That view cannot be squared with ORS 165.540(1)(c) ; it prohibits obtaining only conversations, which are defined as not including telecommunications or radio communications. ORS 165.535(1). Defendant does not cogently explain how a subscriber could use a telephone or radio service-the service to which the person subscribed-to obtain communications that are neither telecommunications nor radio communications (to which the exception separately applies, by cross-referencing ORS 165.540(1)(a) ).[8] And even if it is possible to conceive of such conduct, particularly when thinking of modern *309 technology, it is implausible that the legislature had such conduct in mind in 1961 when it extended the homeowner's exception to apply to the prohibition against face-to-face communications.
We turn to the state's two proffered interpretations of ORS 165.540(3). The state first suggests reading the homeowner's exception to apply whenever a person obtains a communication in the home, whether that communication occurs over the phone or radio or is face-to-face. According to the state, that is likely what the legislature had in mind when it applied the exemption to face-to-face communications. However, the state also correctly points out that that interpretation effectively ignores the word "subscribers" in ORS 165.540(3).
We decline to read the term "subscribers" out of the statutory provision defining the homeowner's exception. We must "construe a statute in a manner that gives effect, if possible, to all its provisions." Crystal Communications, Inc. v. Dept. of Rev. , 353 Or. 300, 311, 297 P.3d 1256 (2013). Even if the state were correct that the legislature intended that the exception apply to any person seeking to obtain face-to-face communications in the home, "the wording ultimately enacted must be capable of carrying out that intention." Rainey , 294 Or. App. at 291, 431 P.3d 98. We cannot pretend that ORS 165.540(3) is not limited to "subscribers and their families."
The state's second suggestion is to interpret "subscribers" to refer to people who subscribe to phone or radio services, without giving the term any additional significance. The state observes that the legislature clearly intended the term to have that meaning when it adopted the 1955 legislation, before it added the paragraph (c) prohibition against obtaining face-to-face communications. According to the state, when that original meaning of the term is carried through to the present day, the result is that the homeowner's exception now allows any person who subscribes to a phone service (or that person's family members) to obtain a communication while in the subscriber's home-whether the communication occurs over the phone or radio or is face-to-face. Recognizing that it might seem arbitrary to extend the exception broadly to telephone subscribers *310 and not to other individuals, the state suggests that such an interpretation may not reflect legislative intent, but that it adheres most closely to a plain reading of the statutory text.
On that point, we agree with the state. Even if we cannot discern the legislature's reason for allowing only-and all-telephone subscribers and their family members to surreptitiously obtain face-to-face communications in the subscriber's home, ORS 165.540(3) plainly applies to "subscribers or *32 members of their family" who engage in conduct otherwise prohibited by ORS 165.540(1)(c) "in their homes," and ORS 165.540(1)(c) plainly covers the act of recording a face-to-face conversation with a person who is not informed that the conversation is being recorded. In the absence of context or legislative history that persuades us that the legislature intended something different, we conclude that we should interpret ORS 165.540(3) in the way most faithful to the statutory text. See Rainey , 294 Or. App. at 291, 431 P.3d 98 (construing a different aspect of ORS 165.540(3) according to its "actual wording"). We therefore construe ORS 165.540(3) to apply to subscribers to telecommunications and radio services (and their family members) who, in their homes, engage in conduct otherwise prohibited by ORS 165.540(1)(c), regardless of whether the subscribed-to service is utilized to obtain the conversation.
Applying that interpretation here, we conclude that the trial court did not err by admitting the conversation that M recorded on her iPhone, notwithstanding that she did not have active telephone service on that device. Defendant subscribed to a telephone service that he used in his home. The trial court determined that M was defendant's family member and that she recorded their conversation while in their home.[9] M's conduct in recording the conversation thus fell within ORS 165.540(3) and the recording therefore was not inadmissible under ORS 41.910. For those reasons, we reject defendant's first assignment of error.
*311 DETECTIVE YERRICK'S TESTIMONY
In conjunction with his fourth assignment of error, defendant challenges the trial court's admission of certain testimony from Detective Yerrick over defendant's objection that the evidence was scientific and lacked an adequate foundation.[10] Yerrick is the detective who interviewed M on the Monday after M told her mother what defendant had done and played the iPhone recording for her. Yerrick testified at trial about what M told her, including descriptions of defendant having touched her sexually on multiple occasions.
Yerrick also testified more generally about her experience as a detective who had, for nearly five years, primarily investigated cases of physical and sexual abuse of children. She explained that she was expected to follow the Oregon Interviewing Guidelines when interviewing minors "[f]or uniformity, and to limit the amounts of suggestibility with children." When asked the age range during which suggestibility was concerning, Yerrick answered, "[m]ostly in the three to four age group. That's a really, really tough group to interview. Once you get into the five and six year old range, you see a little bit more of them correcting you if you say something wrong ***."
Defendant objected to that testimony as scientific evidence that lacked an adequate foundation under State v. Brown , 297 Or. 404, 687 P.2d 751 (1984), and State v. O'Key , 321 Or. 285, 899 P.2d 663 (1995). After discussion outside the jury's presence, the court overruled that objection. Then, once the jury had returned, the prosecutor asked Yerrick if, "in [her] training and experience," "the interviewing of children, little kids like three or four," was "more concerning than older kids." Yerrick responded affirmatively and *33 *312 testified that she would not interview children that young; instead, she would "send them to someone who does forensic interviewing of children full time." She added that interviewing children the victim's age was "definitely a lot easier in [her] opinion."
In response to a different line of questioning, Yerrick also testified that, in the hundreds of child physical and sexual abuse cases she had investigated, the children "are usually children who I, I guess most would consider high risk," explaining:
"In other words, they come from one parent homes. They come from abusive homes where there's parenting issues overall, substance abuse in the home, maybe they've been in and out of foster care, things like that. *** I would say, in a vast majority of the cases that I've investigated, these are not kids that come from your white picket fence families where there's a two parent home and good parental structure and good support systems and things like that. There's usually some area of their life where they are lacking and they're *** high risk kids."
Yerrick also testified that, in thinking about all the cases she had investigated over the years, "maybe a handful" involved an offender who was "a stranger to the child." More typically, the offender was somebody "connected to the family" that "the parent has a good relationship with." Defendant also objected, unsuccessfully, to that testimony as scientific evidence that lacked an adequate foundation.
On appeal, defendant again argues that the quoted portions of Yerrick's testimony were inadmissible because they constituted scientific evidence that lacked an adequate Brown / O'Key foundation establishing the testimony's scientific validity. We understand defendant's arguments to be directed at Yerrick's testimony about the extent to which children may be "suggestible" during interviews and at Yerrick's testimony that, in her experience, people who abuse children often are connected with the victim's family. Defendant acknowledges that Yerrick "did not mention familiarity with any literature or studies" supporting her views. Nonetheless, defendant asserts that Yerrick's testimony required a scientific foundation because it was "based on incidents of a repeated pattern, i.e. social science." In *313 a supplemental brief, defendant analogizes Yerrick's testimony to the evidence at issue in State v. Henley , 363 Or. 284, 422 P.3d 217 (2018), in which the Supreme Court "held that-at least as offered in the context of the trial in that case-evidence about sexual grooming of children 'was scientific evidence under OEC 702 ' that could not be admitted 'without first requiring the state to establish its scientific validity.' " State v. Plueard , 296 Or. App. 580, 582, 439 P.3d 556, adh'd to as modified on recons. , 297 Or. App. 592, 443 P.3d 1195 (2019) (quoting Henley , 363 Or. at 304, 422 P.3d 217 ). Like the evidence in Henley , defendant argues, Yerrick's testimony "was impliedly based in science." (Emphasis in original.)
In response, the state argues that Henley is not controlling because the witness in that case discussed her advanced educational degrees and testified that she had specialized training specifically about grooming, which is part of what led the Supreme Court to conclude that lay jurors would have understood her testimony to have "the persuasive value of scientific principle." 363 Or. at 303, 422 P.3d 217. Here, the state contends, Yerrick's testimony was "explicitly grounded in [her] own practical experience as [a] police officer" and Yerrick-in contrast with the Henley witness-was "not presented as a person with specialized knowledge of a scientific concept." For those reasons, the state concludes that the jury would not have perceived Yerrick's testimony as scientific in nature and the evidence did not, therefore, require a Brown / O'Key foundation.
We begin our analysis by reviewing the Supreme Court's decision in Henley and our subsequent decision in Plueard . In Henley , the Supreme Court concisely explained when evidence is "scientific" such that it requires a foundational showing of scientific validity:
"Expert evidence is 'scientific' under OEC 702 when it is expressly presented to the jury as scientifically grounded ***. Expert evidence also is 'scientific' under OEC 702 when it 'draws its convincing force from some principle of science,' *** or 'implies a grounding in the methods and procedures *34 of science,' and would likely be perceived by the jury as imbued with the 'persuasive appeal of science.' "
363 Or. at 301, 422 P.3d 217 (internal citations omitted).
*314 The challenged evidence in Henley related to "grooming" and came in the form of testimony by a CARES forensic interviewer, Palfreyman, who interviewed a child who had reported being sexually abused. 363 Or. at 288, 422 P.3d 217. Palfreyman testified about her educational background, which included a master's degree in social work and advanced training in forensic interviewing of children. Id . at 289, 422 P.3d 217. The prosecutor asked Palfreyman whether she "had any training regarding a concept called grooming," and she answered affirmatively, explaining both that she had training on grooming during college and that, "due to [her] forensic interview training we talk about grooming *** leading up to offending." Id . at 290, 422 P.3d 217. Palfreyman also testified that grooming is conduct that an offender engages in "to build trust and weaken defense[s] of the child," and she testified that certain activity of the Henley defendant could be considered grooming. Id . at 291, 422 P.3d 217. The Supreme Court held that Palfreyman's testimony was scientific evidence that could not be admitted in the absence of an adequate Brown / O'Key foundation because Palfreyman was presented as an expert with specific training "on the subject of grooming behavior by child sexual abuse offenders," which implied that the substance of the training "was authoritative and grounded in some sort of behavioral science," id. at 302, 422 P.3d 217, and covered information that "was not common knowledge," id . at 304, 422 P.3d 217. In addition, the state used Palfreyman's testimony to establish that, by engaging in specific conduct (massaging the child), the "defendant was grooming [the child] and planning or preparing for his later sexual abuse of [the child]." Id . at 302, 422 P.3d 217. Under those circumstances, the Supreme Court concluded that Palfreyman's testimony about grooming was scientific evidence that could not be admitted without a foundation establishing its scientific validity.
We held in Plueard that testimony about grooming also constituted scientific evidence under the circumstances of that case. In Plueard , as in Henley , the grooming evidence was presented by a CARES interviewer, Petke, who testified on that topic after being asked whether, through her training and experience, she had "become familiar with a phenomenon called grooming." 296 Or. App. at 584, 439 P.3d 556. We observed that "[t]hat phrasing itself [could] evoke, at least *315 in certain contexts, a kind of scientific air, as it suggests the existence of a recognized pattern of conduct that has been determined to have particular significance." Id . at 588, 439 P.3d 556. Given Henley 's recognition that "there is a body of behavioral science research on grooming behavior," and the nexus between Petke's testimony about grooming and her description of her advanced training and experience, we held that the "circumstances would have suggested to the jury that Petke's testimony was grounded in science." Id . Moreover, the jury would have viewed the testimony as scientific, not only because of Petke's specialized education and experience, but also because that testimony included "a definition of grooming, which was not common knowledge." Id .
In our view, the holdings in Henley and Plueard are based on concerns that are not implicated here. In both of those cases, the CARES interviewers were asked questions that, themselves, suggested that the subsequent testimony would have some sort of authoritative scientific character: In Henley , the witness was asked about her training in "a concept called grooming," 363 Or. at 290, 422 P.3d 217 ; in Plueard , the witness was asked whether, through her training and experience, she had "become familiar with a phenomenon called grooming." 296 Or. App. at 584, 439 P.3d 556. Both of those questions would suggest to a jury the existence of some recognized phenomenon that exists independently of the witness's own personal experience. No analogous implication is present here. Yerrick did not purport to explain, based on some outside authoritative source, that her interview technique was guided by principles grounded in science or that it was safe for her to interview this child based on her age. Rather, she testified almost exclusively *35 with respect to her own experience with children, and her brief reference to following a set of guidelines meant to reduce the risk of "suggestibility" did not lend her testimony a "scientific air." Plueard , 296 Or. App. at 588, 439 P.3d 556.[11] Similarly, Yerrick did not suggest that any "phenomenon" formed the basis of her testimony that people who sexually abuse children are only rarely strangers to their *316 victims; to the contrary, she expressly based that on her own experience as a police officer.
Moreover, in both Henley and Plueard , the CARES interviewers had advanced degrees and specific training about grooming. Henley , 363 Or. at 289, 422 P.3d 217 ; Plueard , 296 Or. App. at 584, 439 P.3d 556. In addition, those witnesses testified about the "concept" or "phenomenon" of grooming soon after describing their educational backgrounds, bolstering the implication that the witnesses' understanding of that phenomenon was scientifically based. Yerrick did not give analogous testimony from which the jury could have inferred that she had any specialized level of education-based expertise, much less that her expertise was linked to her testimony about children's suggestibility or the relationships between child victims of sexual abuse and the people who abuse them. Rather, her training on those topics was presented to the jury as limited to her familiarity with the Oregon Interviewing Guidelines. Indeed, on the subject of suggestibility, Yerrick undermined any suggestion of expertise she might otherwise have conveyed when she asserted that she would not interview young children herself, but instead would "send them to someone who does forensic interviewing of children full time."
It also is significant that Yerrick did not purport to draw any scientific- or research-based connection between her challenged testimony and the conduct of M or defendant. In Henley , the witness offered a list of behaviors "that might be considered grooming" before applying her expertise to the case before the jury. 363 Or. at 291-92, 422 P.3d 217. Thus, the evidence suggested to the jury that conduct that might otherwise seem benign (the defendant massaging the child) actually was evidence of the defendant's sexual intention toward his victim. No analogous testimony is present here; Yerrick's testimony was not directed at explaining-based on scientifically derived principles-how otherwise benign conduct might actually be sinister. Rather, Yerrick's testimony was simply that, in her own training and experience, older children are less "concerning" to interview because, as children get older, "you see a little bit more of them correcting you if you say something wrong." That testimony did not *317 suggest that Yerrick's experience was grounded in scientific research.
In sum, the overriding concerns that led to the holdings in Henley and Plueard are not present here. Yerrick would not have "appeared to the jury as an expert" on child suggestibility or the relationships between child abusers and their victims; nor was her testimony presented in a way that would have led the jury to "accord[ ] the testimony the persuasive value of scientific principle." Henley , 363 Or. at 303, 422 P.3d 217. The trial court was not required to exclude the testimony on the ground that the state had not laid a foundation showing its scientific validity under Brown and O'Key .
Affirmed.

The arguments we discuss in the opinion are those raised in defendant's first and fourth assignments of error. We reject without discussion the arguments that defendant raises in his second, third, sixth, eighth, ninth, and tenth assignments of error. We reject the fifth assignment of error for the reasons later set out. See 298 Or. App. at 310 n. 9. In his seventh assignment of error, defendant challenges the trial court's decision to release to defendant only a small portion of certain records from the Department of Human Services (DHS) that the court reviewed in camera . We have reviewed the records provided by DHS in camera and have determined that the trial court did not commit reversible error in not disclosing additional documents to defendant. We reject defendant's seventh assignment of error for that reason.

ORS 165.540 was enacted in 1955 and has been amended numerous times. Or. Laws 1959, ch. 681, § 2; Or. Laws 1961, ch. 460, § 1; Or. Laws 1979, ch. 744, § 9; Or. Laws 1983, ch. 693, § 1; Or. Laws 1983, ch. 740, § 35; Or. Laws 1983, ch. 824, § 1; Or. Laws 1987, ch. 320, § 87; Or. Laws 1989, ch. 983, § 14a; Or. Laws 1989, ch. 1078, § 1; Or. Laws 2001, ch. 104, § 54; Or. Laws 2001, ch. 385, § 4; Or. Laws 2003, ch. 14, § 62; Or. Laws 2007, ch. 879, § 1; Or. Laws 2009, ch. 488, § 2; Or. Laws 2015, ch. 550, § 2; Or. Laws 2015, ch. 553, § 1; Or. Laws 2019, ch. 216, § 3. Although the events of the case occurred before the 2019 amendment, those changes do not affect the analysis.

"Telecommunication" is defined as "the transmission of writing, signs, signals, pictures and sounds of all kinds by aid of wire, cable or other similar connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, equipment and services (including, among other things, the receipt, forwarding and delivering of communications) incidental to such transmission." ORS 165.535(4). "Radio communication" is defined as "the transmission by radio or other wireless methods of writing, signs, signals, pictures and sounds of all kinds, including all instrumentalities, facilities, equipment and services (including, among other things, the receipt, forwarding and delivering of communications) incidental to such transmission." ORS 165.535(3).

Although we often refer to face-to-face conversations in this opinion, because that is the type of communication that the victim recorded, we do not mean to imply that ORS 165.540(1)(c) applies only to that type of communication, and we express no opinion on that point.

Those statutory exceptions are as follows:
"(2)(a) The prohibitions in subsection (1)(a), (b) and (c) of this section do not apply to:
"(A) Officers, employees or agents of a telecommunication or radio communication company who perform the acts prohibited by subsection (1)(a), (b) and (c) of this section for the purpose of construction, maintenance or conducting of their telecommunication or radio communication service, facilities or equipment.
"(B) Public officials in charge of and at jails, police premises, sheriffs' offices, Department of Corrections institutions and other penal or correctional institutions, except as to communications or conversations between an attorney and the client of the attorney.
"(b) Officers, employees or agents of a telecommunication or radio communication company who obtain information under paragraph (a) of this subsection may not use or attempt to use, or divulge to others, the information except for the purpose of construction, maintenance, or conducting of their telecommunication or radio communication service, facilities or equipment.
"* * * * *
"(4) The prohibitions in subsection (1)(a) of this section do not apply to the receiving or obtaining of the contents of any radio or television broadcast transmitted for the use of the general public.
"(5) The prohibitions in subsection (1)(c) of this section do not apply to:
"(a) A person who records a conversation during a felony that endangers human life;
"(b) A person who records a conversation in which a law enforcement officer is a participant, if [certain conditions are met];
"(c) A person who, pursuant to ORS 133.400, records an interview conducted by a peace officer in a law enforcement facility;
"(d) A law enforcement officer who is in uniform and displaying a badge and who is operating [certain types of recording equipment]; or
"(e) A law enforcement officer who, acting in the officer's official capacity, deploys an Electro-Muscular Disruption Technology device that contains a built-in monitoring system capable of recording audio or video, for the duration of that deployment.
"(6) The prohibitions in subsection (1)(c) of this section do not apply to persons who intercept or attempt to intercept with an unconcealed recording device the oral communications that are part of [certain public, governmental, educational proceedings]; or
"(c) Private meetings or conferences if all others involved knew or reasonably should have known that the recording was being made.
"(7) The prohibitions in subsection (1)(a), (c), (d) and (e) of this section do not apply to [certain radio communications]."
The state initially argued that the recording was admissible both under the homeowner's exception, ORS 165.540(3), and under ORS 165.540(5)(a), on the theory that the victim had "record[ed] a conversation during a felony that endangered human life." The state no longer pursues that latter argument.

The complete definition then provided:
"1. One who subscribes; specif. : a One who signs, as a letter, document, agreement, etc. b One who agrees or consents. c One who favors, aids, or supports, as by money contribution or by moral influence, personal membership, etc."
Webster's Second New Int'l Dictionary 2513 (unabridged ed. 1961) (boldface in original).

The 1959 amendment also added additional prohibitions to ORS 165.540(1), included in paragraphs (d) and (e).

Similarly, much of the conduct that defendant suggests the legislature may have wished to protect-like one family member eavesdropping on another's telephone conversation-already would be covered by the homeowner exception's application to conduct otherwise prohibited by ORS 165.540(1)(a).

On appeal, defendant also challenges those aspects of the trial court's ruling, arguing that the homeowner's exception does not apply because-even if defendant's subscription otherwise was sufficient to trigger application of the exception-M was not defendant's family member and was not in her home when she made the recording. We reject those arguments without discussion.

Defendant combines argument on his fourth assignment of error with argument on his fifth assignment of error, in which he contends that the trial court erred by "allowing" Yerrick "to vouch for Complainant under the guise of 'training and experience.' " Although defendant argued to the trial court about what he considered impermissible vouching in other contexts, he did not adequately preserve a vouching objection to the evidence that he appears to challenge in his fifth assignment of error. Indeed, we note that defendant has not, in conjunction with his fifth assignment, identified a specific ruling of the trial court that he contends is error, as ORAP 5.45(3) requires. We reject the fifth assignment of error for those reasons.

On cross-examination, defendant elicited additional testimony from Yerrick about the guidelines and how she tried to follow them when interviewing children, but the additional information that he elicited himself cannot form the basis for his claim that reversal is required.