384 March 5, 2025 No. 179

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ELLIOT McBAIN REDMAN,
*Defendant-Appellant.*

Polk County Circuit Court
21CR21378; A177998

Monte S. Campbell, Judge.

Submitted September 18, 2023.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and James Brewer, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Leigh A. Salmon, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Defendant challenges his conviction for driving while under the influence of intoxicants (DUII), ORS 813.010(4). In two assignments of error, defendant argues that the trial court plainly erred when it permitted a trooper to make certain statements about two field sobriety tests (FSTs), the walk-and-turn test and the one-leg-stand test. The trooper testified that exhibiting two clues on those tests indicates intoxication and that he observed that number or a higher number of clues when administering FSTs to defendant. The trooper also testified that the tests are generally accepted and accurate ways to determine intoxication, and that the clues on the walk-and-turn test are "validated."

In *State v. Hall*, 336 Or App 812, 562 P3d 284 (2024), we recently concluded that the trial court plainly erred when it permitted an officer to testify that two or more clues on the walk-and-turn test and the one-leg-stand test indicates impairment, and that the officer observed a higher number of clues on each test. We reasoned that, because the jury would have perceived the testimony—which relied on an external scoring rubric—as scientific, the trial court should have required the state to lay an adequate foundation before admitting the testimony. The same reasoning applies here. Therefore, the trial court plainly erred when it permitted the trooper to testify about numerical cut-offs and defendant's score on the two tests.

However, we reach a different conclusion regarding the other testimony that defendant challenges. The trial court did not plainly err when it permitted the trooper to testify that the walk-and-turn test and the one-leg-stand test are generally accepted and accurate ways to determine intoxication, and when it permitted the trooper to refer to "validated" clues. As we explain below, it is not obvious or beyond reasonable dispute that the jury would have perceived that testimony as scientific.

Regarding the testimony that the jury would have perceived as scientific, we decline to exercise our discretion to correct the trial court's plain error. Here, defendant may have chosen not to object to the trooper's testimony

about scoring thresholds and defendant's score on the tests for strategic reasons. Defendant sought to establish that FSTs depend on external, objective standards, and that the trooper deviated from those standards in administering the walk-and-turn test and the one-leg-stand test to defendant, who was overweight and had a foot injury. In addition, there was a significant amount of other evidence of impairment, including defendant's poor driving, defendant's own statement that he was "a dumb ass" for driving, and defendant rated himself as a three or a four on a scale of zero to ten for intoxication. The trooper explained to the jury that he observed signs of impairment, and defendant performed poorly on the horizontal gaze nystagmus (HGN) test, a test that was properly admitted without requiring the state to lay a foundation. As a result, the trial court's error in admitting some testimony that required the state to lay an adequate foundation was not so grave such that the ends of justice require reversal. Furthermore, if defendant had objected, the error could have been easily corrected. For each of those reasons, we decline to exercise our discretion to correct the trial court's plain error. Accordingly, we affirm.

## STANDARD OF REVIEW AND PRESERVATION PRINCIPLES

We review the admission of scientific evidence for legal error. *State v. Beltran-Chavez*, 286 Or App 590, 610, 400 P3d 927 (2017). In reviewing a trial court's evidentiary ruling, "we do so in light of the record that was before the court at the time of the ruling." *State v. Eatinger*, 298 Or App 630, 632, 448 P3d 636 (2019). We consider all pertinent parts of the record in assessing whether the error was harmless. *Id.*

Further, before addressing an issue on appeal, we look to whether the issue was preserved, *viz.*, raised in the trial court. *See State v. Dodge*, 373 Or 156, 172-73, ___ P3d ___ (2025) (describing preservation principles). If a claimed error is not preserved, we will not review it unless the error is plain, which occurs when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without our having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). If the trial court plainly erred, whether

we will correct the error involves an exercise of discretion. *State v. Gornick*, 340 Or 160, 167, 130 P3d 780 (2006).

## FACTUAL AND PROCEDURAL BACKGROUND

Because of the nature of defendant's assignments of error and our plain-error analysis, we describe the underlying factual and procedural background in detail. The state charged defendant with one count of DUII based on an investigation that began when Oregon State Trooper Simpson stopped defendant's car late at night in West Salem after observing defendant's vehicle fail to properly stop at an intersection. At his jury trial, the state relied primarily on Simpson's testimony.

Simpson testified that when he stopped defendant, he observed that his eyes were bloodshot and watery, that he had "slow movements," and that his speech was "thick, slurred and slow at times," all of which Simpson described as "indicators of impairment." Simpson testified that he could "smell a strong odor of an alcoholic beverage" on defendant's breath and that he could smell "a smoky odor coming from the vehicle."

Defendant told Simpson that he had one cocktail at about 9:30 p.m., which was about an hour-and-a-half earlier. Simpson asked defendant to rate his sobriety on a scale of zero to ten, with zero being "stone-cold sober" and ten being "falling down drunk," and defendant rated himself as a three and also admitted using marijuana around 9:00 a.m. that morning.

Defendant agreed to perform FSTs. Prior to administering the tests, Simpson asked whether defendant had any medical issues, and defendant responded that he had stepped on a bottle cap at work two days earlier, causing him to twist his right foot or leg, which could affect his balance and which caused him some pain when walking. Defendant also told Simpson that his knees lock when he stands and that he was nervous. In administering the HGN test, Simpson observed four out of six clues or signs of intoxication. Simpson testified that four or more clues on the HGN test indicates intoxication.[1]

---

[1] On appeal, defendant does not argue that it was plain error to admit testimony about defendant's score on the HGN test without requiring the state to lay an appropriate foundation. *See State v. O'Key*, 321 Or 285, 319, 899 P2d 663 (1995) (determining the scientific proposition underlying that test—that alcohol consumption causes nystagmus—is valid).

On the walk-and-turn test, Simpson observed four out of eight "validated clues." Simpson testified that defendant "didn't take heel-to-toe steps. He didn't keep his arms to his side. He stopped during the test, and he stepped off [the] line." On the one-leg-stand test, Simpson observed two out of four clues: defendant "swayed during the test and raised his arms more than six inches." Simpson explained that two or more clues on each of those tests indicates intoxication. Simpson also noticed that defendant had "body tremors which can be an indicator of impairment," and Simpson had to tell defendant several times to put his foot down at the end of the one-leg-stand test.

Simpson asked defendant to rate his sobriety a second time. This time, defendant responded that "he was at a four with his nerves." When Simpson asked defendant if he should have been driving that evening, defendant responded, "'No, I'm a dumb ass for that one.'" Defendant told Simpson that "he'd just had the one drink and that he had waited so he thought he was okay." Defendant also explained that, as a bartender, he was trained to know when someone had consumed too much alcohol, and that he would not let a person drive who was "a five or six on the scale."

Based on his investigation, Simpson arrested defendant. When the trooper searched defendant, he found a "cannabis pen." Simpson transported defendant to the Salem Police Department, where defendant agreed to take a breath test. Prior to the breath test, defendant told Simpson that he thought would have a .09 blood alcohol content (BAC). Ultimately, however, a breath test revealed a .04 BAC. Defendant agreed to provide a urine sample, and he admitted that he had used marijuana or cannabis throughout the day. Defendant told Simpson that he "started smoking marijuana at about 9:00 a.m., and *** that he had continued using his cannabis throughout the day until about 1:30 or 2:00 p.m., and that he had, he estimated, about seven to eight hits off the marijuana pen throughout the day."

Simpson observed that defendant had "eyelid tremors," which can be an indication of impairment from marijuana. When asked to rate his sobriety on a scale from zero to ten for marijuana impairment, defendant responded that

he was a one or two. Simpson explained that asking persons to rate themselves is a "good way to get an understanding of how they're feeling, whether they are noticing or perceiving that adverse effect. If * * * they're at a zero, they're not feeling anything; if they say anything more than that, it gives me an indicator of kind of where they're at in their own mind." Based on his training and observations of defendant that evening, Simpson believed that defendant's "mental and physical faculties were adversely affected to a noticeable and perceptible degree" from both alcohol and cannabis or marijuana use.

During defendant's cross-examination of Simpson, the jury watched bodycam footage of Simpson's interactions with defendant. Simpson testified that his training in FSTs comes from the National Highway Traffic Safety Administration (NHTSA), and that the NHTSA breaks down DUII investigations into three phases, which are vehicle motion, personal contact, and pre-arrest screening. Regarding the first phase of the investigation, Simpson acknowledged that his training manual identifies indicators of driving while intoxicated that defendant did not exhibit, such as almost striking an object or another vehicle, turning in a wide radius, and unnecessary acceleration or deceleration. Simpson did not observe any issues with how defendant pulled over.

Moving on to the personal contact phase of his investigation, Simpson did not observe that defendant had difficulty exiting his vehicle, or that he leaned on his vehicle. Defendant was not slow in responding to questions, he did not give incorrect information, and he did not make unusual statements or use abusive language. Defendant followed instructions, and he did not argue with the trooper. On the videorecording, defendant explained that he was a bartender, that he had not worked that day, which was his "payday," and that he had come to the bar to get his paycheck.

When cross-examined about his administration of the walk-and-turn test, Simpson explained that he had defendant use an imaginary line on the sidewalk rather than a nearby painted straight line because the sidewalk

was flat and level. Simpson acknowledged that he required defendant to perform the walk-and-turn test even though his training manual provides that persons with leg injuries are prone to have problems on the test. When cross-examined on administering the test to someone with an injury, Simpson agreed that his training manual provided, "'[g]ive alternative tests if unusual conditions apply, *i.e.*, overweight, false limb, age, or injury.'" Simpson explained, however, that he did not believe that defendant "met that criteria" based on what defendant told him and the trooper's own observations, and he did not believe that his training manual required him to provide an alternative test.

　　Defendant's cross-examination elicited testimony from Simpson that FSTs have to be administered in a "standardized manner," and that they consist of "standardized clues." However, Simpson disagreed that taking defendant's weight into consideration deviated from the trooper's training or what the manual required. Instead, Simpson looked to "the totality of the circumstances." He testified that a person's weight would not change the number of clues that they display on an FST, but it is a subjective factor that the trooper can consider.

　　With respect to the one-leg-stand test, Simpson acknowledged that a person might be prone to have problems with the test if the person were more than 50 pounds overweight; here, Simpson did not believe that applied to defendant. On the one-leg-stand test, Simpson had to tell defendant repeatedly to stop the test, but he agreed on cross-examination that that was "not a validated clue." Although the test consists of standardized clues, Simpson explained that that "doesn't mean there aren't other indicators of impairment that can be observed during a given test."

　　In closing argument, the state argued that defendant drove while impaired from either alcohol or cannabis use to a noticeable and perceptible degree. Defendant argued that the jury should not accept the trooper's opinion that defendant was impaired. Defendant emphasized that the trooper's training manual provided that he should give alternative tests if unusual conditions apply, that the rules or standards articulated in the training manual were not

discretionary, and defendant argued that the trooper should not have administered the walk-and-turn test or the one-leg-stand test. Ultimately, the jury found defendant guilty of DUII.

## ANALYSIS

On appeal, in two assignments of error, defendant argues that the trial court plainly erred in permitting testimony that the walk-and-turn test and the one-leg-stand test are generally accepted and accurate ways to determine intoxication, that the clues on the walk-and-turn test are "validated," and that two or more clues on each of those tests indicates intoxication. Based on our recent decision in *Hall*, 336 Or App at 813, we readily conclude that the trial court plainly erred in admitting testimony about numerical cut-offs on the two tests and defendant's score on them. The jury would have perceived that testimony as scientific because it is based on the underlying scientific proposition that exhibiting a certain number of clues or signs on the tests shows that the test subject is impaired or intoxicated. The state was required to lay a foundation establishing the validity of that scientific proposition, but the trial court did not require the state to do so.

We further conclude, however, that the trial court did not plainly err when it permitted the trooper to testify that the two tests are "accurate indicator[s] to help determine whether someone is under the influence" of intoxicants, and that they are "generally accepted nationwide" for testing whether a person is under the influence. We also conclude that there was no plain error when the trial court permitted the trooper to refer to the clues on the walk-and-turn test as "validated."

As noted earlier, among the requirements for an alleged error to be considered plain is that the error appears on the record, which means that "the appellate court must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable." *State v. Wiltse*, 373 Or 1, 3, 559 P3d 380 (2024) (internal quotation marks omitted). Here, Simpson indicated that the walk-and-turn test and

the one-leg-stand test are accurate indicators of intoxication, and generally accepted ways of testing for when someone is under the influence of intoxicants, and that the walk-and-turn test consists of "validated clues." It is not obvious or beyond reasonable dispute that the jury would have perceived that testimony as scientific.

We recognize that it can be difficult to distinguish between expert testimony based on "scientific evidence" and expert testimony based on "technical and other specialized knowledge." *State v. O'Key*, 321 Or 285, 291, 899 P2d 663 (1995). In this case, however, the prosecutor expressly asked the trooper to testify based on his training and experience:

"Q   And based on your training and experience, is the walk-and-turn test an accurate indicator to help determine whether someone is under the influence?

"A   It is.

"Q   And based on your training and experience, is the walk-and-turn test generally accepted nationwide as—for testing whether a person is under the influence?

"A   It is."

The trooper's testimony regarding the one-leg-stand test was almost identical:

"Q   And based on your training and experience, is the one-leg-stand test an accurate indicator to help determine whether someone is under the influence of intoxicants?

"A   Yes.

"Q   And based on your training and experience, is the one-leg-stand test a generally accepted method nationwide for testing whether a person is under the influence?

"A   Yes."

Because the trooper's testimony derived from his training and experience, the jury would not necessarily have perceived it as scientific. Unlike the testimony about defendant's score, testifying that those tests are generally accepted and accurate indicators of when someone is under the influence of intoxicants did not rely on an external scoring rubric. The testimony was not "expressly presented to the jury as

scientifically grounded." *State v. Henley*, 363 Or 284, 301, 422 P3d 217 (2018); *see also State v. Evensen*, 298 Or App 294, 317, 447 P3d 23, *rev den*, 366 Or 64 (2019) (rejecting an argument that testimony was scientific in part because it was not presented to the jury in that manner). Nor do the trooper's statements about the tests being generally accepted or accurate indicators appear to draw their convincing force from some principle of science. Thus, we conclude it is not obvious that the jury would have perceived them as imbued with the "'persuasive appeal of science.'" *Henley*, 363 Or at 301 (quoting *O'Key*, 321 Or at 292).

Instead, the testimony was elicited in a manner in which the answers were based on the trooper's training and experience. *See State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013) (observing that "[s]pecialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science"). In asking the questions giving rise to the challenged testimony, the prosecutor may have any number of goals in mind, including simply attempting to establish that the trooper was qualified to administer the tests. It is certainly not obvious or beyond reasonable dispute that the jury would have viewed the challenged statements as scientific. *See State v. Serrano*, 355 Or 172, 182, 324 P3d 1274 (2014), *cert den*, 576 US 1037 (2015) (rejecting plain-error argument because the defendant "has not demonstrated the obviousness of the posited unpreserved error").

The trooper's reference to "validated clues" comes closer to the line between scientific evidence and expert testimony based on training and experience. In *Eatinger*, 298 Or App 630, we determined that an officer's testimony that FSTs were "scientifically validated" and "the product of scientific research," was scientific evidence that required the state to lay an adequate foundation for admission of the testimony. *Id.* at 631, 644. Here, however, the trooper did not use the term "scientific" or "scientifically." Instead, he made two isolated references to "validated clues" when describing the walk-and-turn test. Although use of the term "validated" may have implied that there are studies underlying

the tests establishing their validity, the trooper may also have been attempting to convey to the jury that those are clues that he is trained to identify when administering the FSTs. We cannot say that it is obvious or beyond reasonable dispute that the jury would have viewed the references to "validated clues" as grounded in some principle of science. Once again, because the error is not obvious, it does not meet the requirements for plain-error review.

To recapitulate, the trial court plainly erred in admitting testimony about numerical cut-offs and defendant's score on the walk-and-turn and the one-leg-stand tests. However, the court did not plainly err in admitting testimony about "validated clues" on the walk-and-turn test, or that the two tests are generally accepted and accurate indicators of when someone is under the influence of intoxicants. Given those conclusions, we turn to whether to exercise our discretion to correct the court's plain error in permitting testimony about numerical cut-offs and defendant's score. *See Vanornum*, 354 Or at 640 (explaining that if all three parts of the plain-error test are satisfied, a court must determine whether to exercise its discretion to correct the error); *State v. Horton*, 327 Or App 256, 262, 535 P3d 338 (2023) (explaining that, in evaluating plain error, "[w]e cannot reverse a judgment based on a harmless error, so if the error was truly 'harmless,' then we have no discretion and must affirm"); *see also State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (noting that, under Article VII (Amended), section 3, of the Oregon Constitution, an appellate court will affirm a judgment if there is "little likelihood that the particular error affected the verdict"). For the reasons explained below, we decline to exercise our discretion.

In *State v. Mello*, 332 Or App 215, 549 P3d 42 (2024), we held that the trial court plainly erred in admitting scientific testimony about FSTs without requiring the state to lay a foundation, and that admission of the evidence was not harmless, but we declined to exercise our discretion to correct the error. *Id.* at 220-24. We reasoned that the likelihood that the error affected the verdict was low because the scientific testimony did not apply to all of the FSTs administered, and there was additional evidence of impairment, including

an officer's observations of the defendant's poor driving for nearly nine miles. *Id.* at 222. As a result, the error was "not as grave as in cases where we have exercised our discretion to correct the error." *Id.* at 223. In addition, we noted that the defendant argued during closing argument that the FSTs "'were not done scientifically,'" which supported the state's contention that the defendant may have had a strategic reason for failing to object. We also observed that, if the defendant had objected, the trial court could have easily corrected any error by striking the testimony and instructing the jury to disregard it. *Id.*

A similar analysis applies here. Preliminarily, we recognize that the improperly admitted evidence was not harmless. The testimony about defendant's score on the walk-and-turn test and the one-leg-stand test related to the central factual issue in the case; namely, whether defendant drove while impaired by intoxicants. Moreover, scientific evidence "has manifest potential to influence the jury," which is why the proponent of the evidence must establish a foundation showing that the underlying science is valid. *Beltran-Chavez*, 286 Or App at 617-18. For those reasons, the error in permitting the testimony about numerical cutoffs and defendant's score was not harmless. Nevertheless, we decline to exercise our discretion to correct the error given the circumstances of this case.

In deciding whether to correct a plain error, we consider factors such as the gravity of the error, the nature of the case, and the ends of justice in the particular case. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991). Here, those factors weigh against an exercise of discretion.

In this case, like in *Mello*, 332 Or App at 223, defendant may have had strategic reasons not to object to the trooper's testimony about his score on the two tests. When cross-examining the trooper, defendant sought to establish that the scoring rubric used in those tests derived from the trooper's training manual, and that his NHTSA training required the trooper to administer the tests in a standardized, objective manner. Defendant sought to establish that, if the trooper had adhered to those standards, then

he would not have administered the tests to someone who was overweight and who complained of leg or foot injuries. Furthermore, given his evident familiarity with the trooper's training manual, defendant may have chosen not to object to testimony about defendant's score on the tests to prevent the state from calling a witness who could have explained the validity of the science underlying the tests. Indeed, at one point during the cross-examination, defendant had the trooper turn to the section of his training manual addressing "the San Diego Field Validation Study," which may be one of the studies that the state could have relied on to establish the scientific validity of the tests. *See O'Key*, 321 Or at 309-10 (discussing the research that led to the development of standardized FSTs). Because defendant could have had strategic reasons not to object to the state's failure to lay a foundation for the admission of testimony about defendant's score on the two tests, that circumstance weighs against exercising our discretion to correct the trial court's plain error.

In assessing the gravity of the trial court's error, we also note that there was considerable evidence of impairment from intoxicants. Indeed, defendant described himself as a "dumb ass" for driving, and he rated himself as a three or a four on a scale of zero to ten for intoxication, which suggests, as the trooper testified, that defendant was feeling some effects from his alcohol consumption or cannabis use that day. The trooper observed that defendant's eyes were bloodshot and watery, that defendant had slow movements, and that his speech was "thick, slurred and slow at times." Simpson smelled a "strong odor" of alcohol on defendant's breath and a "smoky odor" coming from his vehicle. As well as having a cocktail, defendant admitted using a considerable amount of marijuana or cannabis that day. Defendant had a "cannabis pen," and Simpson observed that defendant had "eyelid tremors," which can be an indication of impairment from marijuana or cannabis. Simpson also observed that defendant had "body tremors." Furthermore, defendant performed poorly on the HGN test, a test which was properly admitted without requiring the state to lay a foundation. There was also evidence of poor driving, because Simpson

pulled defendant over when his vehicle did not properly stop at an intersection.

That evidence suggests that the jury could have convicted defendant of driving while impaired by intoxicants even if the trial court had excluded testimony about defendant's score on the walk-and-turn test or the one-leg-stand test. In other words, in considering how likely it was that the error may have affected the verdict, there was a low likelihood that it did so. *See Horton*, 327 Or App at 264 (explaining that the likelihood that an error affected the verdict goes to its gravity and to the ends of justice, and "our assessment of where [the error] falls on the spectrum of 'likelihood' of having affected the verdict can be an important consideration to the exercise of discretion"). Thus, because the error in admitting the testimony was not so grave such that the ends of justice require reversing defendant's conviction in this posture, we decline to do so. *See State v. Ortiz*, 372 Or 658, 675, 554 P3d 796 (2024) (emphasizing that appellate review of an unpreserved error as plain error should be exercised with utmost caution and only when justified by the factors identified in *Ailes*).

There is one final reason why we decline to exercise our discretion. Like in *Mello*, 332 Or App at 223, if defendant had objected to the trooper's testimony about numerical cut-offs on the walk-and-turn test and the one-leg-stand test and defendant's score on those tests, then the trial court could have easily corrected the error by striking the testimony and instructing the jury to disregard it. As we recently explained in *Hall*, 336 Or App at 822, officers can testify about their observations of a defendant's performance on the tests and they can also testify that they observed a certain number of clues on the tests; however, without a proper foundation, officers cannot go further and testify in a way that relies on an external scoring rubric. Here, it would have been relatively straightforward for the trial court to strike the testimony about numerical cut-offs and defendant's score without affecting the trooper's ability to otherwise testify about his observations of defendant's performance on the walk-and-turn test and the one-leg-stand test.

For each of those reasons, and considering factors including the gravity of the error, the ends of justice, and the nature of the case, we decline to exercise our discretion to correct the trial court's plain error.

Affirmed.