812 December 18, 2024 No. 906

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CASEY JONN HALL,
*Defendant-Appellant.*

Lincoln County Circuit Court
22CR23014; A180384

Sheryl Bachart, Judge.

Submitted September 27, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Daniel C. Silberman, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Hellman, Judge, and Mooney, Senior Judge.

ORTEGA, P. J.

Reversed and remanded.

Mooney, S. J., dissenting.

## ORTEGA, P. J.

Defendant challenges his conviction for driving while under the influence of intoxicants (DUII), ORS 813.010(4). In his first three assignments of error, defendant argues that the trial court plainly erred when it permitted a police officer to make certain statements during his trial testimony about field sobriety tests (FSTs) and defendant's performance on them. When discussing the walk-and-turn test and the one-leg-stand test, the officer testified that the presence of two standardized clues on each of those tests indicates impairment and that he observed a higher number of clues than that. Applying the reasoning of *State v. Beltran-Chavez*, 286 Or App 590, 400 P3d 927 (2017), and *State v. Reid*, 312 Or App 540, 492 P3d 728 (2021), we conclude that the jury would have perceived that testimony as scientific, but the state failed to lay a foundation for the admission of the evidence. As a result, the trial court plainly erred in allowing the testimony. As we will explain, we exercise our discretion to review and correct that error. We therefore reverse and remand.[1]

### I.   STANDARD OF REVIEW

We review the admission of scientific evidence for legal error. *Beltran-Chavez*, 286 Or App at 610. In reviewing a trial court's evidentiary ruling, "we do so in light of the record that was before the court at the time of the ruling." *State v. Eatinger*, 298 Or App 630, 632, 448 P3d 636 (2019). We consider all pertinent parts of the record in assessing whether the error was harmless. *Id.* We do not review unpreserved errors unless the error is plain, which occurs when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without our having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). If the trial court plainly erred, whether we will correct involves an exercise of discretion. *State v. Gornick*, 340 Or 160, 167, 130 P3d 780 (2006).

---

[1] Because we reverse and remand on that ground, we do not address defendant's fourth assignment of error in which he argues that the trial court abused its discretion in overruling defendant's objection to the police officer refreshing his recollection without a memory impairment.

## II.  FACTS

Toledo Police Officer Dean stopped defendant's car at about 10:00 p.m. because defendant's temporary registration was mounted on the right-hand side of his rear window instead of the left-hand side. It was windy and raining heavily. Defendant was in the driver's seat, and a woman was in the passenger seat. Defendant had bloodshot and watery eyes, and Dean could smell alcohol coming from the car. He spotted a wine glass with red liquid in it and a can of White Claw in the center console, and he also saw an empty wine glass on the floor. Defendant denied having anything to drink.

Dean administered three FSTs: the horizontal gaze nystagmus (HGN) test, the walk-and-turn test, and the one-leg-stand test.[2] Before the tests, Dean asked about medical

---

[2] The HGN test is designed to detect whether a person's eyes demonstrate nystagmus, which is an involuntary rapid movement of the eyeball. *State v. O'Key*, 321 Or 285, 294, 899 P2d 663 (1995). Administrative rules explain how officers must conduct each of those three tests. When describing the HGN test, OAR 257-025-0020(1)(a) provides, in part:

"The officer shall use a stimulus (such as a finger, pencil or penlight) held vertically in front of the person's face approximately 12 to 15 inches away from the person's face. The person tested must hold their head still. The officer, during the administration of the testing procedures, should conduct the testing procedures in the order listed unless circumstances or conditions dictate otherwise:

"(A) The officer shall move the stimulus from the center of the face to the side, checking for the lack of smooth pursuit of the eyes as they track the stimulus;

"(B) The officer shall check for distinct nystagmus at the maximum deviation of each eye;

"(C) The officer shall check for the onset of nystagmus prior to 45 degrees in each eye."

OAR 257-025-0020(1)(b) provides:

"Walk and Turn Test: The officer will instruct the person, while standing, to place the person's left foot on a line (if no line is available, use a general direction for the person to walk an imaginary line) then place the right foot on the line with the heel of that foot ahead of the toes of the left foot. Instruct the person to take nine steps down the line, keeping arms at sides, looking at feet, and counting each step while walking heel-to-toe. Instruct the person how to turn (at the discretion of the officer) and to walk back in the same manner previously described. Generally demonstrate the test."

OAR 257-025-0020(1)(c) provides:

"One Leg Stand: Instruct the person to stand straight with the person's feet together and arms at the sides. Instruct the person to raise one foot approximately six inches off the ground while looking at the foot, and to count '1001, 1002, 1003,' etc., until told to stop by the officer. The officer will

conditions, and defendant replied that he was hypoglycemic, diabetic, and that he had a "broken back" and some neck injuries. Later, defendant also indicated that he had had knee surgery three months earlier. Nevertheless, defendant said that he did not need any food or sugar to help take the tests, and he told Dean that he was able to walk in a straight line.

Dean started with the HGN test, which he administrated under a covered awning that had some light and was sheltered from the wind and rain. During the tests, defendant's passenger left in a taxi. Dean observed five out of six "standardized clues" of impairment. He administered the test a few more times to confirm the result, and each time observed five out of six clues.

On the walk-and-turn test, Dean observed five out of eight "standardized clues" of impairment. He testified that the eight clues are: (1) inability to stay in the instruction position; (2) starting the test too soon; (3) raising arms for balance; (4) stepping off the line; (5) not taking heel-to-toe steps; (6) improper turns; (7) stopping during the test; and (8) wrong number of steps. Dean noticed that defendant raised his arms for balance, stepped off the line, took a "wrong turn," stopped during the test, and took the wrong number of steps.

On the one-leg-stand test, Dean observed three out of four "standardized clues," which are (1) swaying; (2) raising arms for balance; (3) putting the foot down; and (4) hopping. Dean noted that defendant swayed, raised his arms, and put his foot down.

Dean testified that the presence of four or more clues on the HGN test and two or more clues on the walk-and-turn test and the one-leg-stand test indicates impairment. On those tests, as noted, Dean observed five, five, and three clues respectively. Based on defendant's performance on the FSTs, Dean believed that defendant was impaired and arrested him for DUII.

During an inventory of the contents of defendant's car, Dean found, on the driver's seat, a Ziploc bag with a white substance consistent with methamphetamine and a pipe with

---

then time the person for thirty seconds. The person will count 1001, 1002, 1003, etc., until told to stop by the officer. The officer may conduct the same test with the other foot. Generally demonstrate the test."

a crystal residue. In the center console, Dean found a pipe with dark-colored residue consistent with marijuana. Dean had not observed those items during his initial inspection of the car. The passenger who ultimately left in a taxi had been sitting alone in the car for about an hour. Defendant told Dean that the passenger had smoked methamphetamine earlier.

Dean obtained a search warrant for defendant's blood and urine. When asked if the urine sample would test positive for methamphetamine, defendant replied, "maybe from another day, but not today," and that he "took a hit of it" the day before with his passenger and had last smoked marijuana "yesterday." A laboratory test of defendant's urine revealed the presence of both methamphetamine and marijuana. Methamphetamine can be detected in urine from one to four days after usage, or up to a week for heavy users. Marijuana is detectable in urine for one to six days, or up to several weeks for heavy users. A laboratory test of defendant's blood sample revealed a blood alcohol content (BAC) of 0.012 percent.

The state charged defendant with DUII. At his jury trial, the jury heard testimony from Dean, from the paramedic who drew defendant's blood, and from two forensic scientists who worked for the Oregon State Police crime laboratory. The jury watched bodycam footage of Dean's administration of the FSTs and his interaction with defendant at the police station. The jury found defendant guilty.

## III.  ANALYSIS

On appeal, in his first three assignments of error, defendant argues that the trial court erred in admitting testimony about FSTs that constituted scientific evidence without requiring the state to lay a proper foundation. We begin by describing the relevant legal framework for evaluating those claims.

### A.  *Legal Framework*

The salient rule of evidence is OEC 702, which provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert

by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

What constitutes "scientific" evidence has never been "precisely defined." *State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003). In *State v. Brown*, 297 Or 404, 407, 687 P2d 751 (1984), the Supreme Court explained that scientific evidence "draws its convincing force from some principle of science, mathematics and the like." In *State v. O'Key*, 321 Or 285, 291, 899 P2d 663 (1995), the court observed that "it is difficult to set a more definitive boundary between 'scientific' evidence and 'technical or other specialized knowledge,' which are the other types of evidence requiring expert proof." In *O'Key*, the court focused on whether the trier of fact would perceive the evidence as scientific, which often depends on whether the underlying propositions are based on common knowledge or would be unfamiliar to lay jurors. *Id.* at 291-97. Thus, evidence is "scientific" if it "implies a grounding in the methods and procedures of science" and if the jury will perceive it as carrying the "persuasive appeal of science." *Id.* at 292 (internal quotation marks omitted).

If evidence is scientific, then the proponent of the evidence must lay a sufficient foundation for its admission based on the nonexclusive list of factors discussed in *Brown*, 297 Or at 417, and *O'Key*, 321 Or 299-306. Those factors include whether the theory or technique in question can be and has been tested; whether it has been subjected to peer review or publication; the known or potential rate of error; the existence of standards governing the use of the technique; its degree of acceptance in the relevant scientific community; and the expert's qualifications. *See O'Key*, 321 Or at 309-17 (applying those and other factors to discern whether HGN test evidence is scientifically valid). The purpose of requiring the state to lay a sufficient foundation for the admission of scientific testimony is to establish the scientific validity of the evidence. *Id.* at 305. By requiring a sufficient foundation before admitting scientific testimony, the trial court performs its role as "gatekeeper": it ensures that the trier of fact does not attach an undue aura of reliability to "scientific" evidence that is not valid. *Id.* at 302 n 20.

Turning to police officer testimony about intoxication and FSTs, in *Beltran-Chavez*, 286 Or App at 604, we recognized that "certain officers may be practical experts in recognizing intoxication, and, when they are, they may offer expert opinions on that topic without first showing that the process by which they arrive at their opinions is scientifically valid, provided that their testimony does not imply that it is based on science." Thus, police officer testimony that a defendant is intoxicated based on "commonly recognized signs of impairment or the more detailed signs of impairment that an officer obtains from his or her specialized training and experience" does not imply that the testimony is based on science. *Id.* at 614.[3]

However, we went on to conclude that "a jury would perceive the proposition underlying the testimony that a defendant 'failed' the walk-and-turn test or the one-leg-stand test as scientific." *Id.* We explained that "the proposition underlying that testimony is that the test is able to measure impairment objectively and that a special numerical score can prove that the subject is impaired. \*\*\* [T]hat proposition is grounded in scientific research." *Id.* Later, in *Reid*, 312 Or App at 542-43, we held that it was plain error to allow an officer to testify that the end result of a defendant's performance on FSTs was "a pass or fail."

Guided by that legal framework, we consider whether the trial court plainly erred in admitting Dean's testimony about FSTs.

B. *The officer's testimony that a specific score on two FSTs indicates impairment, and that defendant's score was higher, was scientific evidence.*

Because it is dispositive, we focus on defendant's second assignment of error, in which he argues that it was

---

[3] For a list of acts, signs, and symptoms that are typically present in circumstances of intoxicant impairment, *see* OAR 257-025-0010 (describing signs or symptoms including difficulty in walking, standing, and following directions; unusual walking; odor of alcoholic beverage on the breath; flushed or pale appearance; speech difficulties or unusual speech patterns; disorderly or unusual conduct or demeanor; lack of muscular coordination or muscular tremors; evidence of mental disturbance; visual disorders or difficulties; sleepiness or drowsiness; dizziness; nausea or vomiting; mood swings; difficulty with divided attention; and bloodshot, watery or glassy eyes); *see also State v. Clark*, 286 Or 33, 39-40, 593 P2d 123 (1979) (taking judicial notice of 11 common physical manifestations of intoxication).

error to admit testimony that the presence of a certain number of "standardized clues" on FSTs indicates impairment. That contention is based on the following testimony:

"Q   And based on your training and experience, how many of these standardized clues that you've described are you trained to look for on the HGN, the walk and turn, and the one-leg stand, as indicators of impairment?

"A   For the HGN, you're supposed to look—if you see four, then walk and turn for two, one-leg stand, two.

"Q   Okay. And just to clarify, you saw five, five, and three; was that your testimony?

"A   Yes."[4]

We focus on the walk-and-turn test and the one-leg-stand test. Here, Dean did not expressly testify that defendant "failed" those tests, but that was certainly the implication when he testified that two clues on those tests indicates impairment, and that he observed five and three clues on them. We are persuaded that the jury would have viewed the officer's testimony as indicating that defendant failed those tests, even though the officer did not use the word "fail." *See Beltran-Chavez*, 286 Or App at 612 ("A jury's understanding of whether testimony is scientific is not based exclusively on whether the expert witness uses scientific-sounding jargon or words that are susceptible to only scientific meanings. Juries are capable of recognizing scientific substance when they hear it.").

The rationale for viewing "pass/fail" testimony as scientific applies equally to testimony that observing two or more clues on the walk-and-turn test or the one-leg-stand test indicates impairment. Like in *Beltran-Chavez*, 286 Or App at 611, that testimony "relies on an external scoring rubric to prove that the defendant was objectively, measurably impaired." A jury would perceive the proposition underlying the testimony as scientific, indicating "that the test is able to measure impairment objectively and that a specific numerical score can prove that the subject is impaired." *Id.*

---

[4] Dean's probable cause affidavit states that he observed four clues on the walk-and-turn test, not five. The affidavit states that defendant raised his arms for balance, stepped off the line, turned improperly, and stopped during the test. At trial, Dean testified that defendant also took the wrong number of steps.

at 614. The scoring thresholds used in those tests are the product of scientific research. *See id.* at 607 n 11 (discussing the scientific research underlying the development of the walk-and-turn test and the one-leg-stand test and later "validation studies"). Therefore, when an officer testifies that two clues on the walk-and-turn test or the one-leg-stand test indicates impairment and that the officer observed that number or a higher number of clues, the testimony is scientific. As a result, it is inadmissible unless the state lays a *Brown/O'Key* foundation. Here, the state did not attempt to do so. As a result, the trial court erred in admitting the testimony.

The scope of our holding relates specifically to the walk-and-turn and one-leg-stand tests; a different analysis applies to the HGN test evidence. In *O'Key*, the Supreme Court determined that jurors would perceive HGN test evidence as scientific evidence and that the general proposition supporting such evidence—that alcohol consumption causes nystagmus—is scientifically valid. 321 Or at 297, 308-19. Consequently, when Dean testified that observing four clues on the HGN test indicates impairment and that he observed five, the jury would have perceived that evidence as scientific, but it was not legal error for the trial court to admit that evidence because the Supreme Court already has determined that HGN test evidence is scientifically valid. *See id.* at 293 ("Once a trial court has decided that proffered expert scientific testimony is scientifically valid and has admitted such evidence for the particular purpose to which it is directed, and that decision is affirmed by this court in a published opinion, it will become precedent controlling subsequent trials."); *see also id.* at 293 n 8 ("The proponent of evidence derived from a particular scientific technique or test that this court has found to be scientifically valid need not introduce expert foundational testimony to demonstrate scientific validity. The validity of such scientific evidence, if not assumed, may be established by judicial notice.").[5]

---

[5] We note that observing an odd number of clues on the HGN test may indicate that something other than alcohol consumption is causing the nystagmus. *O'Key*, 321 Or at 312-13. However, our point here is simply that the state does not need to lay a foundation for the admission of HGN evidence because it has already been determined to be scientifically valid.

However, the same analysis does not apply to the officer's testimony about the scoring thresholds used in the walk-and-turn and one-leg-stand tests. Generally, an officer's testimony about a defendant's performance on those tests will not be perceived as scientific evidence because those tests "obtain their legitimacy from effects of intoxication based on propositions of common knowledge." *Id.* at 297. For example, lay jurors are generally presumed to know that intoxicated persons experience difficulty with balance and that the walk-and-turn test and the one-leg-stand test are designed in part to detect that effect. *See, e.g.*, *State v. Mazzola*, 356 Or 804, 818, 345 P3d 424 (2015) (explaining that psychomotor FSTs "test balance and divided attention, or the ability to perform multiple tasks simultaneously" (internal quotation marks omitted)).

Nevertheless, when an officer testifies that observing two clues on the walk-and-turn test and the one-leg-stand test indicates impairment and that the officer observed that or a higher number of clues, then the jury would perceive that testimony as scientific. It "relies on an external scoring rubric to prove that the defendant was objectively, measurably impaired." *Beltran-Chavez*, 286 Or App at 611. In addition, it is not common knowledge that exhibiting a certain number of clues on those tests indicates impairment. Our concern here is with scoring thresholds used for those two tests. The state must establish that impairment from intoxicants is reliably measured using those scoring thresholds before an officer can testify that a certain number of clues on them indicates impairment. Without explaining the scientific validity of that proposition that scoring two or higher on those tests indicates impairment, the testimony gives the test results an "undue aura of reliability." *O'Key*, 321 Or at 302 n 20. Here, the state did not attempt to establish that foundation, so that testimony was inadmissible.[6]

---

[6] Our holding does not depend on the officer's reference to "standardized" FSTs or "standardized" clues; instead, we focus on the scores used in the tests. In *State v. Ortiz*, 372 Or 658, 669, 554 P3d 796 (2024), the Supreme Court noted that "[t]he fact that law enforcement officers are trained to administer the walk-and-turn and one-leg-stand tests in a standardized way—one that has been approved by [the National Highway Traffic Safety Administration] and is described in [Oregon State Police] rules—is a fact that, standing alone, does not impermissibly suggest that the tests are grounded in science."

Our holding does not affect officers' ability to testify about their personal observations of defendants while conducting DUII investigations, their observations of acts, signs, and symptoms of intoxicant impairment, *see* OAR 257-025-0010, or their "opinions based on their training and experience about whether defendants are impaired from intoxicants. *See State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013) ("Specialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science."). Likewise, with respect to the walk-and-turn test and the one-leg-stand test, officers can testify about their observations of a defendant's performance on those tests. As we explained in *Beltran-Chavez*, 286 Or App at 606, jurors will not perceive that testimony as scientific because it relates "to commonly known observable symptoms or signs of alcohol impairment that comport with jurors' own knowledge and experience and, perhaps, additional signs identified by the officer based on his or her practical expertise." (Internal quotation marks omitted.) As a result, officers can testify that they observed a certain number of clues on the walk-and-turn test and the one-leg-stand test.

However, without a proper foundation, officers cannot go further and testify that observing two or more clues on those tests indicates impairment and that they observed that number, or a higher number, of clues on each of those tests. That testimony is the equivalent of testifying that the subject failed the tests, which is scientific evidence that is only admissible subject to establishing the scientific validity of the evidence.[7]

Here, the state did not attempt to lay a foundation before Dean testified that observing two clues on the

---

[7] The dissent focuses on the fact that Dean did not use the word "fail" or "failure" when he testified that two out of four clues on the walk-and-turn test and the one-leg-stand test indicates impairment and that he observed five and three clues on those tests. But the pivotal consideration is whether the evidence would be perceived as scientific. In *Beltran-Chavez*, 286 Or App at 611, we explained that jurors would perceive testimony that a defendant "failed" the tests as scientific because it "relies on an external scoring rubric to prove that the defendant was objectively, measurably impaired." Exactly the same rationale applies to Dean's testimony. A "jury would perceive as scientific the propositions that the test is able to measure impairment objectively and that a specific numerical score can prove that the subject is impaired." *Id.* at 615 n 17.

walk-and-turn test and the one-leg-stand test indicates impairment, and that he observed five and three clues on those tests. Like the testimony in *Reid*, that testimony indicates that a specific numerical score can prove that the subject is impaired. Because the state did not attempt to lay a foundation, admission of the testimony was legal error that is "obvious, not reasonably in dispute," and it appears on the face of the record. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381, 823 P2d 956 (1991). It was plain error for the trial court to allow that testimony.[8]

C.  *The error was not harmless, and we exercise our discretion to correct it.*

Next, we consider whether the error was harmless and whether to exercise our discretion to correct it. The testimony directly related to the central factual issue in the case and scientific testimony is particularly persuasive, so the error in permitting the testimony was not harmless. *State v. Mello*, 332 Or App 215, 221, 549 P3d 42 (2024). For the following reasons, we also conclude that it is appropriate to exercise our discretion to correct the error.

In deciding whether to correct a plain error, we consider factors such as the gravity of the error, the nature of the case, and the ends of justice in the particular case. *Ailes*, 312 Or at 382 n 6. The likelihood that an error affected the verdict goes to its gravity and to the ends of justice, and "our assessment of where [the error] falls on the spectrum of 'likelihood' of having affected the verdict can be an important consideration to the exercise of discretion." *State v. Horton*, 327 Or App 256, 264, 535 P3d 338 (2023). In *Mello*, 332 Or App at 222-23, an officer had observed the defendant's poor driving for nearly nine miles, so there was additional evidence of the defendant's impairment. By contrast, here, defendant was not pulled over for poor driving; instead, he

---

[8] The dissent argues that it is not obvious that Dean's testimony about scoring thresholds and defendant's score was scientific evidence. But, in *Reid*, 312 Or App at 543-44, we held that it was obvious that testimony about passing or failing the walk-and-turn test was scientific evidence. For the reasons already explained, the same rationale applies to Dean's testimony. That is the basis for our conclusion that it is obvious that the jury would have perceived Dean's testimony about scoring thresholds and defendant's score as scientific.

was stopped because he was displaying his temporary registration on the wrong side of his rear window.

In addition, the other evidence of impaired driving in this case was not strong. Although Dean testified that defendant had bloodshot and watery eyes and that he could smell the odor of alcohol coming from the vehicle, and although he observed two wine glasses and a White Claw in the vehicle, defendant consistently denied that he had been drinking, he stated that the passenger had been drinking, and his BAC was only 0.012 percent, well below the legal limit of 0.08. Tests indicated the presence of both marijuana and methamphetamine in defendant's system, and defendant admitting using those substances "yesterday," but it is not clear how close in time that occurred to when he was driving. On one of the bodycam recordings, when asked to rate his intoxication on a scale of one to 10, defendant said "zero." Thus, other than Dean's testimony about defendant's performance on the FSTs, the evidence that defendant drove while impaired was not overwhelming. We therefore conclude that the officer's testimony about the scoring thresholds used in the walk-and-turn test and the one-leg-stand test and defendant's score on those tests likely had a significant impact on the jury's verdict. As a result, the error in admitting that testimony was sufficiently grave such that the ends of justice support reversal.

In arguing otherwise, the state points out that "the DUII investigation, including the administration of the FSTs, was recorded on the officer's body camera and admitted at trial. Thus, the jury was able to view and independently assess whether defendant appeared intoxicated." Having reviewed the bodycam footage, we are not persuaded by that argument. On the recording of the one-leg-stand test, it would be difficult for the jury to assess defendant's performance because, for the most part, the officer's arm is blocking the camera. Further, a lay juror would not necessarily have viewed defendant's performance on the walk-and-turn test as seen on the recording as particularly bad, so Dean's testimony that a score of two on that test indicates impairment and that he observed five clues was likely significant. Throughout the recordings, defendant complains about the weather conditions, about being cold, and about

his medical ailments. Thus, Dean's improperly admitted testimony likely had a significant influence on the jury's decision to convict defendant of DUII.

The state argues that defendant may have made a strategic choice not to object to Dean's testimony about "standardized" FSTs because defendant sought to cross-examine Dean about whether he correctly accounted for environmental conditions when administering the tests. We are not persuaded by the state's argument, because that cross-examination does not depend on or benefit from leaving unchallenged Dean's testimony about defendant's score on the walk-and-turn or the one-leg-stand tests.[9]

We recognize that discretion to reverse based on an unpreserved error should be exercised with "'utmost caution.'" *Gornick*, 340 Or at 166 (quoting *Ailes*, 312 Or at 382). Nevertheless, given that case law already plainly establishes that officers may not testify that a defendant "failed" those tests, it would be inconsistent to allow officers to provide testimony that is the functional equivalent of saying that the defendant failed the tests. Considering the interest of the parties, the nature of the case, the gravity of the error, and the ends of justice, we exercise our discretion to correct the trial court's failure to require the state to lay a foundation for admission of that scientific testimony.

We remand the case to the trial court where it may hold a *Brown/O'Key* hearing to determine whether the testimony about defendant's score on the walk-and-turn test and the one-leg-stand test is scientifically valid. If the trial court determines that the state has met its burden of showing that it is, then it may reenter defendant's conviction for

---

[9] We dispute the dissent's claim that we have failed to articulate the gravity of the error. If, for example, there had been additional evidence of impairment, such as evidence of poor driving, or a higher BAC, or if we could discern a strategic reason for defendant's failure to object, then we might have concluded that the error in admitting evidence that the jury must have perceived as scientific without requiring the state to lay an adequate foundation was not so grave as to require reversing defendant's conviction. *See, e.g.*, *Mello*, 332 Or App at 222-24. Here, by contrast, the evidence of impaired driving was not especially strong without the testimony at issue, nor can we discern a strategic reason for the failure to object. We have exercised discretion to correct the error in full recognition of the factors counseling against doing so except in rare cases, based on our careful consideration of the record in this case.

DUII. *See, e.g.*, *State v. Henley*, 310 Or App 813, 815-16, 486 P3d 853, *rev den*, 368 Or 638 (2021) (describing a similar process followed on remand from the Supreme Court's determination that testimony about grooming constituted scientific evidence that required a foundational showing under OEC 702).

Reversed and remanded.

**MOONEY, S. J.,** dissenting.

I would not reverse defendant's DUII conviction on the basis of unpreserved plain error. I write separately to explain why.

Defendant did not preserve the claim of error he now raises for the first time on appeal. When the arresting police officer, Dean, gave the testimony that defendant now argues was inadmissible because it lacked the proper scientific foundation, defendant did not object. He and his lawyer instead sat silent as that testimony was given. Consequently, neither the trial court nor the state were alerted to the issue, and the court necessarily did not rule on the evidentiary issue the majority now relies on to reverse defendant's conviction. And yet before we "may address whether a trial court committed an error in any of the particulars of the trial of a case, the adversely affected party must have preserved the alleged error in the trial court and raised the issue on appeal by an assignment of error in its opening brief." *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991); ORAP 5.45(1). The majority nevertheless reverses defendant's conviction by concluding, somewhat paradoxically, that the error that his lawyer either missed or chose to ignore was so plain and obvious that the trial judge should have intervened, made the objection, and then sustained it. I do not agree.

The Supreme Court has "frequently warned that the decision to reverse based on a plain error should be made with utmost caution because it is contrary to the strong policies requiring preservation and raising of error." *State v. Ortiz*, 372 Or 658, 666, 554 P3d 796 (2024) (internal quotation marks omitted). I would heed that warning here because it is well-settled that "[t]he one-leg stand test [and] the walk-and-turn test * * * are not scientific evidence,

because they 'obtain their legitimacy from effects of intoxication based on propositions of common knowledge' and not from scientific principles." *State v. Henley*, 363 Or 284, 298, 422 P3d 217 (2018) (quoting *State v. O'Key*, 321 Or 285, 297, 899 P2d 663 (1995)).

Officer Dean testified that he was trained to look for certain behaviors while administering the one-leg-stand test and the walk-and-turn test because when those behaviors occur in the context of those tests, they are clues or signs of impairment. He offered this testimony about the walk-and-turn test:

"Q  [PROSECUTING ATTORNEY]  Okay. And you talked earlier about how you instruct and demonstrate the walk-and-turn test. Are there standardized clues of impairment that you're looking for in that test as well?

"A  [OFFICER DEAN]  Yes. There is eight standardized clues. For this incident, I had observed five of those eight clues.

"Q  [PROSECUTING ATTORNEY]  Okay. And what are those clues?

"A  [OFFICER DEAN]  The, like I said earlier, the instruction position. There's the—you put your feet, left foot on the line, right foot heel-to-toe, arms down at your side, remain in this position while I instruct the test. And stay in that position. That instruction position, you're not supposed to walk out of it unless being told to do so, and you're not supposed to step out of it. So those two clues there.

"And the next clue, when they're asked to begin the test, is don't raise your arms for balance. So if you're going like this, that's a clue. If you step off line, so if you step off line, that's a clue. If you miss heel-to-toe, so if you're like a foot, a gap, or, you know, even just a little bit, that's not heel-to-toe.

"If you do an improper turn, so a series of small steps around your lead foot, as I instructed. If they don't do that correctly, that's a clue. If they stop, so if they stop and then proceed, that's another clue as well.

"And wrong number of steps. So if they're counting steps or they say 'seven' and they take a couple steps and

then take another, that's, you know, wrong number of steps as instructed.

     "So those are the eight clues that we're trained to observe."

Officer Dean gave similar testimony about the signs of impairment he was trained to look for when administering the one-leg-stand test. It has been clear since 1995 that such testimony does not plainly qualify under OEC 702 as "scientific."

          The majority extends the judicial concept of plain error too far when it concludes that Officer Dean's testimony "that two clues on the walk-and-turn test or the one-leg-stand test indicates impairment and that [he] observed that number or a higher number of clues" amounts to scientific testimony because it *implies* that defendant "failed" those tests. 336 Or App at 819-20. We have certainly held that an officer's testimony that a defendant "failed" the walk-and-turn and one-leg-stand tests qualified as scientific. *State v. Beltran-Chavez*, 286 Or App 590, 608-09, 400 P3d 927 (2017). But in so holding, we focused on the use of the word "failed" and we expressly disagreed with the notion that that specific word was "merely *** shorthand for the officer's testimony regarding whether [the] defendant's performance on the test demonstrated sufficient impairment to indicate intoxication." *Id.* at 609-10.

          As the majority acknowledges, Dean was permitted to testify that he observed "a certain number of clues on the walk-and-turn test and the one-leg-stand test." 336 Or App at 822. And unlike the testimony at issue in *Beltran-Chavez*, Dean did not testify that "defendant's numerical score on the test, alone, indicated failure[.]" 286 Or App at 611. He did not use the word "fail" or "failure" and he did not testify that any such "failure" meant that defendant was, in fact, impaired. Dean instead described the behavior that he was trained to look for and what he actually observed as defendant performed the FSTs. That is qualitatively different because it does not resolve the issue of impairment for the jury. It gave jurors information about how defendant physically performed as he moved through the FSTs—information that the jury was entitled to consider as it reached its

own decision about whether defendant was impaired. It is not surprising that defendant sat silent when Dean gave the testimony defendant now argues was scientific, and, given our case law, it is also not surprising that the trial court did not affirmatively intervene in the absence of an objection. If there was error, it was not plain error.

Even if I could be persuaded that any unpreserved error was plain, I would not exercise the court's discretion to reverse that error. "To reverse based on an unpreserved, plain error, [we] must, in addition to determining that the error was not harmless, consider the factors that are relevant to the court's exercise of discretion at step two of the *Ailes* framework." *Ortiz*, 372 Or at 672. The majority certainly refers to the *Ailes* factors, but it does not truly assess whether "the gravity of [the] unpreserved error warrants reversal *** to ensure that the ends of justice are satisfied[.]" *Ortiz*, 372 Or at 672. That determination is different than merely determining that reversal would be constitutionally permissible. The majority does not articulate the gravity of the perceived error, and it does not say why the existence of that error alone means that the ends of justice could not be satisfied without reversing the jury's verdict and the judgment of the court.

At most, the majority discusses the evidence and notes that Dean's testimony "likely had a significant impact on the jury's verdict." 336 Or App at 824. Dean's testimony no doubt did play a significant role. But the body camera footage of the traffic stop likely also played a significant role. I do not agree with the majority's assertion that the jury would not have perceived defendant's performance on the FSTs "as particularly bad." *Id.* at 824-25. I, too, watched the video that was shown to the jury, and it may well have perceived defendant's conduct as showing signs of impairment. It is not enough to simply discuss and reweigh the evidence—even in the face of plain error—and then reverse the judgment below. I would leave it alone.[1]

---

[1] I would also reject defendant's fourth assignment of error.