No. 287 April 8, 2026 381

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RONALD JEAN LANDOWSKI,
*Defendant-Appellant.*

Wallowa County Circuit Court
22CR04593; A183824

Thomas B. Powers, Judge.

Argued and submitted January 7, 2026.

Peter G. Klym, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Erica L. Herb, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Deputy Attorney General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Defendant appeals from a judgment of conviction for Driving Under the Influence of Intoxicants (DUII), following a jury trial. An officer stopped defendant after the officer observed him accelerating and spinning his tires on the road. During the stop, the officer suspected that defendant was intoxicated, and, after performing field sobriety tests (FSTs), placed him under arrest. On appeal, defendant contends that the trial court erred when it denied his motion to suppress evidence of his FSTs and that it plainly erred when it admitted an officer's testimony about the number of "clues" that indicate impairment on FST's without laying a foundation for admitting scientific evidence. We conclude that the trial court correctly denied the motion to suppress and decline to exercise our discretion to correct any error related to the officer's testimony about defendant's performance on the FSTs. We therefore affirm.

## MOTION TO SUPPRESS

Defendant first assigns error to the denial of his motion to suppress. Before trial, defendant moved to suppress all the evidence obtained from the stop, arguing that he was stopped without probable cause. After a hearing, the trial court concluded that the officer had probable cause to believe that defendant had committed the offense of careless driving, a traffic violation, ORS 811.135, and denied the motion.

"[T]o stop and detain a person for a traffic violation, an officer must have probable cause to believe that the person has committed a violation." *State v. Little*, 326 Or App 788, 789, 533 P3d 1107 (2023) (internal quotation marks omitted). "Probable cause has two components: (1) at the time of the stop, the officer must subjectively believe that a [traffic] violation has occurred; and (2) that belief must be objectively reasonable under the circumstances." *Id.* "The objective component of the probable-cause inquiry asks whether the facts, as perceived by the officer, constitute a violation of a statute." *State v. Stookey*, 255 Or App 489, 496, 297 P3d 548 (2013). However, "probable cause may be based on a mistake of fact or on a mistake as to which law the

defendant violated." *State v. Hughes*, 311 Or App 123, 132, 488 P3d 795 (2021) (emphasis and internal quotation marks omitted).

On appeal, the parties do not dispute that Officer Curtis had a subjective belief that defendant committed a traffic violation. Defendant argues, however, that Curtis did not have subjective probable cause that defendant committed the specific offense of careless driving, because he testified his "main motive" for stopping defendant was for "exhibition of speed or acceleration." Yet that is sufficient to establish that he had subjective probable cause that defendant committed a traffic violation when he stopped defendant.[1] And, as we explain below, his testimony about his observations that evening and the reasonable inferences from it support the trial court's finding that there was objective probable cause to stop defendant for careless driving.

"Whether the facts establish probable cause to stop someone for a traffic violation is a question of law that we review for legal error." *State v. Husk*, 288 Or App 737, 739, 407 P3d 932 (2017), *rev den*, 362 Or 665 (2018). In making that assessment, "we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them." *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). As to anything on which the trial court did not make express findings, if "there is evidence from which the trial court could have found a fact in more than one way, we will presume that the trial court

---

[1] In his memorandum of additional authorities, defendant argues for the first time that, under the reasoning in *State v. Maciel-Figueroa*, 361 Or 163, 389 P3d 1121 (2017), to support probable cause, an officer must have a subjective belief that the defendant committed a specific crime or type of crime, and that belief must be objectively reasonable. He argues that, because Curtis testified that the only offense he believed defendant committed was the offense of exhibition of speed or acceleration, and because the trial court found that the facts he testified to were not sufficient to support objective probable cause that defendant violated that statute, Curtis did not have probable cause to stop defendant. However, defendant did not raise that argument before the trial court. He argued, instead, that Curtis did not observe enough illegal driving conduct to support subjective or objective probable cause for any traffic violation at all. "Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000). In the absence of a request for plain error review, we decline to reach this issue. *State v. Atwood*, 332 Or App 495, 498 n 2, 549 P3d 51 (2024) ("[W]e normally will not exercise [our] discretion in the absence of an explicit request for plain-error review and concomitant plain-error arguments.").

decided the facts consistently with the trial court's ultimate conclusion." *Id.* at 166.

So framed, we turn to the evidence presented at the suppression hearing. Curtis testified that he was parked on the main road in Enterprise on a January evening when, at approximately 8:40 p.m., he heard a vehicle slipping its tires on ice. He saw a truck making a right turn onto the main road, about one block away from him. He described "the driver accelerat[ing] hard" and saw the truck spinning its wheels as it pulled onto the main road. He testified that the truck "hit the dry pavement and continued spinning," causing a cloud to appear behind the vehicle. He estimated that the truck stopped accelerating after traveling half a block. He testified that "whenever you're spinning your tires, you don't have complete traction on the road and so you're basically out of control. You could slip one way or another." After observing the truck driving normally for the remainder of the block and making another turn in front of him, Curtis initiated a stop.

The trial court found that defendant accelerated in a manner that caused the wheels of his truck to spin on dry pavement for half a block, for at least a few seconds, such that the vehicle did not have traction on the road because its wheels were not in controllable contact with the ground. Ultimately, the trial court concluded that the evidence of that lack of control was sufficient to show that there was probable cause to believe that defendant was driving in a manner that endangered or would be likely to endanger people or property within the meaning of the careless driving statute.

"A person commits the offense of careless driving if the person drives any vehicle upon a highway or other premises described in this section in a manner that endangers or would be likely to endanger any person or property." ORS 811.135(1). The conduct targeted by the statute is the "manner" in which a person operates a vehicle on the road. *Cf. State v. Bliss*, 363 Or 426, 434, 423 P3d 53 (2018) (noting that an officer could stop an "erratic driver" for careless driving). That is, that manner of driving must "endanger[] or would be likely to endanger any person or property," which

could include defendant, his truck, or the people or property around it. The facts must support an objectively reasonable belief that the risk of harm created by the manner of defendant's driving is not merely speculative, but must create a danger that is likely to occur. *See Stookey*, 255 Or App at 500 (the unsafe condition of a vehicle "endanger[s]" a person when it is probable that it would inflict harm or loss upon a person).

Curtis observed defendant driving in a manner that caused his half-ton truck to fail to maintain traction on dry pavement, for a half-block, along a main road in Enterprise. That lack of traction was supported by the officer's observation of a cloud rising up behind defendant's vehicle. The trial court found that, as a result of defendant's driving, the vehicle's wheels were not in controllable contact with the ground and concluded that this was likely to put a person or property in danger of probable harm or loss because of the risk that defendant would lose control of the trajectory of his vehicle. We agree that it was objectively reasonable that this conduct created a risk of a collision that was not speculative under the circumstances: the facts support a reasonable inference that defendant failed to control a vehicle, and lacking control of one's vehicle creates a probable risk of harm. As a result, we agree with the trial court that those facts are sufficient to bring defendant's conduct "within the ambit" of ORS 811.135, the prohibition on careless driving. *Id.*

## OFFICER'S TESTIMONY ABOUT FSTS

In his second and third assignments of error, defendant argues that the trial court plainly erred when it allowed Curtis to testify that the presence of a certain number of "clues" on FSTs indicate a subject's impairment or intoxication without laying a scientific foundation for that evidence. The state responds that, even if the errors are plain, any error is harmless, and, in the alternative, that we should not exercise our discretion to correct them.

As we explain below, the trial court plainly erred when it permitted Curtis to testify about the number of clues on FSTs that indicate impairment without requiring the state to lay a scientific foundation for the testimony. *State v.*

*Hall*, 336 Or App 812, 819-20, 562 P3d 284 (2024), *rev den*, 373 Or 712 (2025) (plain error to admit testimony that the presence of a certain number of clues on standardized FSTs indicates impairment and the defendant exhibited at least that many clues without first establishing a scientific foundation for the evidence). We further conclude that the error was not harmless but, for the reasons set out below, decline to exercise our discretion to correct it.

An error is "plain" when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without our having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). If we conclude that a plain error occurred, the next question is whether it was harmless. *State v. Ortiz*, 372 Or 658, 671, 554 P3d 796 (2024) ("Under Article VII (Amended), section 3, of the Oregon Constitution, an appellate court may not reverse a criminal defendant's conviction based on an error—whether preserved or unpreserved—that is harmless."). Finally, if an error is both plain and not harmless, we must decide whether to exercise our discretion to correct it. *Id.* at 672.

Because of the nature of defendant's assignment of error and our plain-error analysis, we recount the trial evidence in some detail. Curtis testified that after stopping defendant, defendant had trouble locating his license and registration, even though Curtis could clearly see his license in his wallet, and that this was a sign of impairment. He also testified that he could smell alcohol, and that the smell got stronger once defendant exited the vehicle. Curtis observed that he used the door handle of his truck to steady himself as he exited the vehicle. Defendant denied drinking alcohol and agreed to perform FSTs.

Curtis testified that there are three standardized FSTs as well as other FSTs, and that based on his training and experience, he can determine whether a person is exhibiting symptoms of impairment based on their performance on those tests. He testified that each standardized FST has "clues" that he was trained to look for, and that the presence of a specific number of clues during a person's performance of the standardized FSTs indicates that they

are impaired. He then testified about each of the FSTs he conducted. During that testimony, the portion of his body-cam video relating to each test was played for the jury.

Curtis first administered the Horizontal Gaze Nystagmus (HGN) test. He explained that he was trained to look for signs of impairment based on how a subject's eyes track a moving object. He testified that he was unable to evaluate defendant for clues on this test, because defendant was not cooperating with the test by moving his head, by squinting his eyes, and by failing to focus on the pen he was using as a stimulus. He also performed two non-standard FSTs involving tracking a moving object: a vertical gaze nystagmus test and a lack of convergence test. He testified that he did not observe any signs of impairment on those tests.

Curtis then administered the walk-and-turn test, another standardized FST that is a divided attention test. He explained that the person must first stand holding a heel-to-toe posture as officers demonstrate the test until they are instructed to perform the test. He testified that he was trained to look for eight total clues, two in the instruction portion, and six in the performance phase, and that the presence of at least two clues indicates intoxication. Based on his training and experience, Curtis testified that the walk-and-turn test is an accurate indicator of intoxication. After playing that portion of the body-cam video to the jury, Curtis testified that he observed four clues, which indicated intoxication. Because of the angle of the camera, it was not possible to see three of the clues that Curtis observed and documented in his report—beginning the test too early in the instruction phase, failure to touch heel-to-toe, and stepping off the line. During cross-examination, Curtis explained that the fourth clue—"stopping" during the test— is actually signified by a break in defendant's cadence before executing the 180-degree turn over his lead foot. That break in cadence is not obvious on the video. Curtis testified that he developed probable cause to arrest defendant for DUII after he completed this test.

Curtis conducted three additional tests. He testified that, on the one-leg-stand test, another standard FST,

he was trained to look for four total clues, and that the presence of two clues indicates intoxication. He stated that he observed one clue: putting a foot down. He also conducted a "modified Romberg balance test," which required defendant to close his eyes, tilt his head up, and estimate the passage of 30 seconds. He testified that defendant estimated 30 seconds in 38 seconds, outside the "acceptable range" of plus-or-minus five seconds for this test. He explained that "being at 38 seconds, he was slow; so [defendant's time estimation] was depressed a little bit." Finally, he conducted an "alphabet test," in which defendant was required to close his eyes, tilt his head up, and recite the alphabet from B to Q without singing. He testified that this tests divided attention as well as cognitive impairment. Defendant was unable to recite the alphabet from B to Q as directed, and Curtis arrested him for DUII.

Approximately three hours later, a breath test read defendant's blood alcohol at 0.07 percent, which is below the statutory limit of 0.08 percent. The state's expert witness testified that by using retrograde extrapolation, defendant's blood alcohol level at the time he was stopped was estimated to be 0.08 or 0.09 percent.

We agree with defendant that it was plainly erroneous for Curtis to testify about the number of clues that indicate intoxication on the standard FSTs without first establishing an appropriate scientific foundation. The testimony indicated that those FSTs can measure impairment objectively, and that a certain numerical score can prove that the subject is impaired. *Hall*, 336 Or App at 819-20. Because a jury would likely perceive that testimony as having a scientific basis, *id.* at 819, and "scientific evidence has manifest potential to influence the jury, *** the proponent of the evidence must establish a foundation showing that the underlying science is valid," *State v. Redman*, 338 Or App 384, 395, 566 P3d 5 (2025) (internal quotation marks omitted).

Moreover, whether defendant was impaired by alcohol was the central factual issue at trial, and because the testimony about the number of clues Curtis observed during the standardized FSTs bore directly on that issue, we cannot

say that the error in admitting that testimony was harmless. *Id.*; *State v. Eatinger*, 298 Or App 630, 646, 448 P3d 636 (2019) (erroneous admission of scientific testimony about the defendant's FST performance was not harmless because it "bore directly" on the central issue of impairment).

We must next decide whether to exercise our discretion to correct the error. In doing so, we consider factors such as the gravity of the error, the interests of the parties, the ends of justice in the particular case, and whether the policies behind the general rule requiring preservation of error have been served. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991). The likelihood that an error affected the verdict goes to its gravity and to the ends of justice, and "our assessment of where [the error] falls on the spectrum of 'likelihood' of having affected the verdict can be an important consideration to the exercise of discretion." *State v. Horton*, 327 Or App 256, 264, 535 P3d 338 (2023).

Here, evidence that Curtis observed four clues on the walk-and-turn test, coupled with the testimony that the presence of two clues indicates intoxication, and that he developed probable cause to arrest defendant for DUII at that point, was among the evidence tending to show that defendant was intoxicated. Finally, defendant's score on the walk-and-turn test was emphasized by the prosecutor in closing argument. Thus, we conclude that the testimony about the number of clues on the walk-and-turn test that indicate intoxication was likely important.

However, defendant also provided a breath sample that showed that he had consumed alcohol. Defendant's blood alcohol level was extrapolated to between 0.08 percent to 0.09 percent at the time he was stopped, from an Intoxilyzer reading of 0.07 percent taken three hours later in the evening. The state established an adequate scientific foundation both for the accuracy of the breath test and, as the state's expert testified, for the "conservative" calculations used to extrapolate defendant's blood alcohol level. Although the state did not try this case solely as a *per se* impairment case based on defendant's blood alcohol content (BAC), *see* ORS 813.010(1)(a), (c) (0.08 percent statutory reference point

for driving under the influence of intoxicants), that evidence strongly suggests that defendant was, in fact, intoxicated. Framed slightly differently, had the only evidence of defendant's impairment been the FSTs, we may be inclined to exercise our discretion. But the evidence of defendant's blood alcohol level as demonstrated by the breath test was significant evidence of defendant's impairment. In light of that evidence, we believe that the likelihood that the error affected the verdict is on the lower end of the spectrum, which, as noted above, is "an important consideration to the exercise of discretion." *Horton*, 327 Or App at 264.

Additionally, the policies behind the general rule requiring preservation of error were not served. *See State v. Inman*, 275 Or App 920, 935, 366 P3d 721 (2015), *rev den*, 359 Or 525 (2016) ("[T]he ease with which any error could have been avoided or corrected should be a significant factor in an appellate court's decision whether to exercise its discretion to correct a plain, but unpreserved, error."). Had defendant objected, the trial court could have easily struck the objectionable testimony.

Accordingly, considering the gravity of the error, the ends of justice, and the policies behind the general rule requiring preservation of error, we decline to exercise our discretion to correct the error.

Affirmed.